**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John B. LEVY, Defendant-Appellant.**

**No. 77–5782.**

United States Court of Appeals,
Fifth Circuit.

Sept. 18, 1978.

Rehearing and Rehearing En Banc
Denied Oct. 27, 1978.

James A. McPherson, New Orleans, La., for defendant-appellant.

Edward L. Shaheen, U. S. Atty., D. H. Perkins, Jr., J. Ransdell Keene, Asst. U. S. Attys., Shreveport, La., for plaintiff-appellee.

Before COLEMAN, GEE and RUBIN, Circuit Judges.

GEE, Circuit Judge:

The defendant was indicted on one count of conspiracy to transport fraudulently obtained securities in interstate commerce and two counts of sending such securities in interstate commerce, in violation of 18 U.S.C. §§ 371 and 2314. He was tried before a jury and convicted on all three counts. In this appeal defendant raises two issues worthy of discussion. First, he contends that the statute, 18 U.S.C. § 2314, does not contemplate the offenses charged in the indictment. Second, he contends that the evidence adduced at trial is not sufficient to support his conviction. The district court denied defendant's motion to dismiss the indictment and his motion for a judgment of acquittal. We affirm.

Viewed in the light most favorable to the government, see *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the evidence produced below revealed the following: The defendant was secretary of Commercial Leasing & Financing, Inc. (Commercial). On May 29, 1973, Commercial engaged Don A. Baxter and Son (Baxter), a general contractor, to erect a 68-unit condominium, known as Les Maisons de Ville, on some undeveloped property owned by Commercial. Commercial financed the construction through an agreement with Alison Mortgage Investment Trust (Alison) of California. Under the terms of this agreement Baxter would submit periodic draw requests for work completed. When these requests were approved by the architect, Alison would send the amount requested, less ten percent withheld pending satisfactory completion of the project, to its attorney, Frank Simoneaux, in Baton Rouge. Simoneaux would then transfer the funds to Commercial's account at the American Bank & Trust Company in Lafayette Louisiana (Lafayette bank). The agreement specified that Commercial was to use these funds to pay Baxter. Although the agreement expressly forbade sale of the project without Alison's consent, Commercial sold the project in the first quarter of 1974 to Marbane Investments Company, owned by Marvin Poole.

On March 29, 1974, Baxter submitted a draw request for $161,472. This request was signed by William Rozelle, the owner of Commercial, and notarized by the defendant. In response Alison wired a check for $160,324, representing ninety percent of the funds requested plus an unexplained supplement of $15,000, to Simoneaux, who transferred the funds to Commercial's account at the Lafayette bank. On April 5, four days before the funds arrived but after the request had been submitted, defendant wrote a check on the Lafayette bank account for $45,000 and sent it to an account at the Citizens National Bank in Beaumont, Texas (Beaumont bank). Defendant had opened the Beaumont bank account in Commercial's name without the knowledge of Rozelle. On April 8, defendant wrote a similar check on the Lafayette bank account for $55,000 and deposited it in the Beaumont bank account. Both of these checks were returned through national banking channels to the Lafayette bank for payment. Between March 29 and April 11, defendant also wrote ten checks totalling $271,000 to Poole.

The $160,324 received by Commercial as a result of the March 29 draw request was

never paid to Baxter. Poole did give Baxter four checks totalling $100,000 to cover expenses incurred in connection with the project. However, Poole stopped payment on these checks. When Baxter threatened to halt construction, he was assured that Poole would replace the money with funds obtained from an unidentified northern source. Baxter was never paid the amounts due him under the draw request, and he eventually ceased construction of the project. The mortgage on the property was foreclosed, and Alison purchased it at a judicial sale.

1. The indictment reads as follows:

*COUNT I* From on or about the 1st day of February, 1974, and continuing to the 30th day of May, 1974, at Lafayette, in the Western District of Louisiana, and elsewhere, JOHN B. LEVY and MARVIN RUELL POOLE, the defendants, wilfully and knowingly did combine, conspire, confederate and agree together to commit an offense against the United States in violation of Title 18, United States Code, Section 2314, that is: (1) to knowingly, wilfully, and with unlawful and fraudulent intent cause to be transported in interstate commerce from Beaumont, Texas, to Lafayette, Louisiana, certain securities of a stated value of more than $5,000, knowing the said securities and money represented therein to have been taken by fraud.

It was part of the conspiracy that the defendants diverted and converted and caused to be diverted and converted to their own use certain funds and monies disbursed to Commercial Leasing and Financing Co. by Alison Mortgage Investment Trust of Los Angeles, California, which funds and monies were intended to be distributed to the general contractor, Don A. Baxter, in payment for costs incurred in the project called Les Maison De Ville, and which funds were disbursed by Alison Mortgage Investment Trust pursuant to loan disbursement request numbered # 8 dated April 8, 1974, and which funds were deposited to the Commercial Leasing and Financing Co., Inc., Special Account # 01–1866–4 at American Bank and Trust Co., Lafayette, Louisiana, on April 10, 1974. It was further a part of the conspiracy that the defendants fraudulently diverted and caused to be diverted $100,000 of said disbursement to a bank account in Beaumont, Texas, by means of two bank checks. It was further part of the conspiracy that the defendants converted this money to their own use and did not pay Don A. Baxter, the person to whom the money was to be disbursed.

The defendant's first contention is that the indictment did not charge an offense covered by 18 U.S.C. § 2314. In relevant part section 2314 reads:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . . [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Count I of the indictment[1] charged that the defendant had conspired with Poole to

In furtherance of the conspiracy and to effect the objects thereof, the defendants committed the following overt acts within the Western District of Louisiana:

(1) JOHN B. LEVY signed a Resolution on behalf of Commercial Leasing and Financing Co., Inc. on March 19, 1974, authorizing W. C. Rozelle to sell, dispose of, transfer, exchange, etc., land, tenements and other things for any amount and on any terms he deems proper.

(2) On March 19, 1974, JOHN B. LEVY, MARVIN RUELL POOLE and others signed a cash sale deed purporting to transfer Commercial Leasing and Financing Co., Inc.'s interest in the Les Maison De Ville project to Marbane Investments, Inc.

(3) On March 29, 1974, JOHN B. LEVY signed a verification on a disbursement request numbered # 8 requesting that Alison Mortgage Investment Trust forward $161,-472.00 (construction reserve) to Commercial Leasing and Financing Co., Inc. for purposes enumerated by the Contractor in the request.

(4) On April 10, 1974, in Lafayette, Louisiana, JOHN B. LEVY caused American Bank and Trust Co. to pay and post two checks, numbered 268 and 244, written on the Commercial Leasing and Financing Co., Inc. Special Account # 01–1866–4 payable to Commercial Leasing and Financing Co., Inc., totalling $100,000 and signed by JOHN B. LEVY.

(5) JOHN B. LEVY caused to be deposited the above two checks to a Commercial Leasing and Financing Co., Inc. Account # 0–22–752 at the Citizens National Bank, Beaumont, Texas, and subsequently to travel in interstate commerce back to American Bank and Trust in Lafayette, Louisiana.

(6) Between March 29, 1974, and April 11, 1974, JOHN B. LEVY signed and executed a total of eleven checks and securities on the Account # 0–22–752 in Beaumont, Texas, made payable to MARVIN RUELL POOLE;

transport two securities[2] in interstate commerce knowing these "securities and the money represented therein" to have been taken by fraud. Counts II and III charged the defendant with the actual transportation of these two securities in interstate commerce, knowing that they "and the money represented therein" had been obtained by fraud. The defendant argues that while the statute prohibits interstate transportation of fraudulently obtained "securities" and fraudulently obtained "money," it does not prohibit the hybrid of securities and money represented therein alleged in the indictment.

The defendant's second assertion of error, which challenges the sufficiency of the evidence, raises the same issue in a different guise. The evidence was clearly sufficient for the jury to find that the defendant fraudulently obtained the funds sent by Alison on the representation that they would be used to pay Baxter and that he sent two checks totalling $100,000 from Louisiana to Texas. But, the defendant argues, the specific funds obtained by fraud

did not move in interstate commerce.[3] The two checks that defendant sent from Louisiana to Texas did move in interstate commerce, but they themselves were not obtained by fraud: as secretary of Commercial, defendant had authority to write checks on Commercial's Lafayette bank account. Just as the indictment seeks to combine the checks with the money they represented, the government's evidence is sufficient only if the funds from Alison and the two checks written by defendant can be considered a single entity in varying forms.

Both of defendant Levy's contentions rely on the same interpretation of the statute, i. e., that the very security obtained by fraud must move in interstate commerce. Such a narrow reading of the statute has been rejected by the Fifth Circuit, as well as the other two circuits that have considered the issue. *See United States v. Pomponio,* 558 F.2d 1172 (4th Cir. 1977); *United States v. Poole,* 557 F.2d 531 (5th Cir. 1977); *United States v. Caci,* 401 F.2d 664 (2d Cir. 1968), *vacated in part on other grounds sub nom. Giordano v. United*

---

Marvin Poole and Associates; and/or Marbane Real Estate; said checks and securities totalling $271,000.00 and all of which were deposited at American Bank and Trust Co. in Opelousas, Louisiana.

(8) MARVIN RUELL POOLE tendered the above four checks for a total of $100,000 to the contractor for the Les Maison De Ville project, Don A. Baxter, and Baxter deposited the same in his account at Franklin State Bank and Trust in Winnsboro, Louisiana.

(9) MARVIN RUELL POOLE caused payment to be stopped on the above four checks and on April 23, 1974, and April 25, 1974, Baxter's account at Franklin State Bank and Trust was charged $100,000.

All of the above-described overt acts being in violation of Title 18, United States Code, Section 371

*COUNT II* On or about April 8, 1974, in the Lafayette Division of the Western District of Louisiana, JOHN B. LEVY, knowingly and wilfully with unlawful and fraudulent intent, did cause to be transported in interstate commerce from Beaumont, Texas, to Lafayette, Louisiana, a certain check No. 344, dated April 5, 1974, in the amount of $55,-000.00, drawn on American Bank and Trust Company, Lafayette, Louisiana, made payable to the other of Commercial Leasing and

Financing Co., Inc. signed by John Levy, knowing the said security and money represented therein to have been taken by fraud, all in violation of 18 U.S.C. 2314.

*COUNT III* On or about April 5, 1974, in the Lafayette Division of the Western District of Louisiana, JOHN B. LEVY, knowingly and wilfully with unlawful and fraudulent intent, did cause to be transported in interstate commerce from Beaumont, Texas, to Lafayette, Louisiana, a certain check No. 268, dated April 4, 1974, in the amount of $45,-000.00, drawn on American Bank and Trust Company, Lafayette, Louisiana, made payable to the order of Commercial Leasing and Financing Co., Inc., signed by John Levy, knowing the said security and money represented therein to have been taken by fraud, all in violation of 18 U.S.C. 2314.

2. 18 U.S.C. § 2311 defines securities to include checks.

3. Although it appears that the government could have used the movement of *Alison's* check from California to Louisiana to satisfy the interstate commerce element of the statute, the government did not choose to do so. *See* n. 1, *supra.*

*States,* 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969), *cert. denied in part,* 394 U.S. 917, 89 S.Ct. 1180, 22 L.Ed.2d 450 (1969), *cert. denied in part sub nom. Cino v. United States,* 394 U.S. 917, 89 S.Ct. 1188, 22 L.Ed.2d 450 (1969), *cert. denied in part sub nom. Sorgi v. United States,* 394 U.S. 931, 89 S.Ct. 1201, 22 L.Ed.2d 461 (1969); *United States v. Walker,* 176 F.2d 564 (2d Cir.), *cert. denied,* 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949). *Cf. United States v. Walls,* 577 F.2d 690 (9th Cir. 1978) (language of opinion suggests that the court did not consider the problem).

In *United States v. Walker, supra,* Judge Learned Hand, writing for the Second Circuit, held that a mere change in form of the fraudulently obtained security before it moved in interstate commerce did not take the defendant's conduct out of the statute. The defendant had obtained two checks from his victim by going through the form of marrying her even though he was already married. Before leaving the State of Texas, where he first obtained the checks, he took them to a bank and exchanged them for cash and traveler's checks. He then took these proceeds to New York. Judge Hand analogized this factual situation to one in which a defendant defrauded someone of bills of a large denomination and exchanged them for smaller bills before leaving the state. Referring to the law of equity, he refused to hold that the proceeds of fraudulently obtained property could not themselves be considered fraudulently obtained. Although recognizing that this changed-form doctrine might have its limits, 176 F.2d at 566, Judge Hand considered this case so close to his hypothesized exchange of large bills for smaller ones as to be indistinguishable. In *United States v. Caci, supra,* the Second Circuit cited *Walker* to support its holding that the defendant's conspiracy to steal jewels, fence them in the same state and then transport the proceeds to another state constituted a conspiracy to violate section 2314.

The Fourth Circuit adopted Judge Hand's analysis in *United States v. Pomponio, su-*

*pra.* There the defendants first obtained a third party's endorsement on a promissory note by purporting to pledge stock that they did not own. On the basis of this fraudulently obtained endorsement, the defendants procured a cashier's check for $2,000,000 from a bank in the same state. One of the defendants then took the check to another state. Relying on Judge Hand's analysis in *Walker,* the court reasoned that since the endorsement was obtained by fraud, the cashier's check was also literally taken by fraud. The court held that the fact that the bank, which had issued the only security that actually moved in interstate commerce, was not the victim of the fraud did not prevent conviction under section 2314.

Finally, in *United States v. Poole, supra,* this court acknowledged the changed-form doctrine of *Walker* but held that it did not apply to the facts of that case. Having sold a nonexistent "heavy duty earth excavator" to a Louisiana corporation, the defendant deposited the purchaser's check, drawn on a Baton Rouge, Louisiana, bank, in his own account at a Lafayette, Louisiana, bank. He then wrote a check on his Lafayette account for the same amount as the purchase price and deposited it in his account at Citizens National Bank in Beaumont, Texas. The government argued, as it does here, that the check that moved from Louisiana to Texas represented the fraudulently obtained check in a changed form. After discussing *Walker,* the court ruled that it did not apply to Poole's actions because at the time the interstate check was returned to the Lafayette bank for payment there were sufficient legitimate funds, i. e., funds other than those attributable to the fraudulently obtained check, in the defendant's account to cover the check. Thus, the court reasoned that the check sent from Louisiana to Texas could not be said to have been paid by the proceeds of the ill-gotten and solely intrastate check given to Poole by the defrauded purchaser. In a footnote the court noted that it was not required to determine whether a different result would follow if there had been insufficient legiti-

mate funds in the account at the time the check was presented to the drawee bank for payment. 557 F.2d at 536 n. 8.

In the instant case we must resolve the issue left open in *Poole*. The evidence adduced at trial reveals that Commercial's Lafayette account contained only $27,284.38 in legitimate funds at the time the two checks sent to Beaumont were returned to the Lafayette bank for final payment. The proceeds of Alison's check were the only funds that could have been used to pay the two interstate checks. Thus, there can be no doubt that the two checks sent to Beaumont represented the funds illegally acquired from Alison. The sole question is whether this relationship between the two interstate checks and the fraudulently obtained check is sufficiently close for us to treat the latter as having moved, albeit vicariously, in interstate commerce in the shape of the former.

■ Our analysis of this issue is guided by two principles governing the construction of criminal statutes. First, if a criminal statute is truly ambiguous, any ambiguity must be resolved in favor of the defendant. *See, e. g., United States v. Bramblett,* 348 U.S. 503, 509, 75 S.Ct. 504, 99 L.Ed. 594 (1955). Second, a criminal statute should be fairly construed in accordance with the legislative purpose behind its enactment. *See, e. g., United States v. Turley,* 352 U.S. 407, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). The principle of strict construction "does not mean that every criminal statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature." *United States v. Bramblett, supra* at 510, 75 S.Ct. at 508.

■ The statute prohibits the interstate transportation of "any goods, wares, merchandise, securities or money, of the value of $5,000, or more, knowing the same to have been . . . taken by fraud . . ."

18 U.S.C. § 2314. Read literally the statute would require that the very object taken by fraud be transported in interstate commerce. However, such a narrow reading of the statute would clearly frustrate the purpose of Congress:

> Congress had in mind preventing further frauds or the completion of frauds partially executed. But it also contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful get away and thus make the state's detecting and punitive processes impotent.

*United States v. Sheridan,* 329 U.S. 379, 384, 67 S.Ct. 332, 335, 91 L.Ed. 359 (1946) (footnote omitted). Clearly the defendant's actions are within the range of conduct that Congress sought to make criminal. If we look through the form of the defendant's acts to their substance, it is apparent that he transported his ill-gotten gains from Louisiana to Texas, where they were outside Louisiana's jurisdiction. First, the defendant had money in the Lafayette bank account, and after sending his two checks to Texas, he had money in the Beaumont bank account.[4]

We are reinforced in our decision by a consideration of the effects of a contrary ruling here. First, if Levy's conduct falls outside the statute, sophisticated criminals will be able to spirit stolen funds from one state to another through the use of checking accounts and thereby: (1) remain immune from federal criminal laws; and (2) remove the proceeds of their wrongdoing from the jurisdiction of the state where the offense took place. In *Poole, supra,* we stated that a defendant who opened an account solely with stolen funds, then wrote a check for the entire amount deposited and transported that check across state lines

---

4. Defendant argues that, as far as the government's evidence reveals, no cash moved from Louisiana to Texas; the Lafayette bank may simply have made a bookkeeping entry giving the Beaumont bank credit through a corresponding bank. But this argument is not responsive to the government's theory of the case. The government did not rely on the movement of cash to satisfy the interstate aspect of the offense. The two checks written by defendant moved in interstate commerce. Thus, the movement or nonmovement of cash is unimportant. The only relevant aspect of the drawee bank's payment of the two interstate checks is the fact that the bank necessarily used funds attributable to the Alison check.

would come under the *Walker* doctrine. *See United States v. Poole, supra* at 535 n. 7. We discern no practical difference between such a case and one in which the defendant deposits $100,000 in a pre-existing account with a prior balance of, say, $1.00 and then sends checks drawn on that account for $100,000 in interstate commerce.[5] And there is certainly no meaningful distinction between that case and the one now before us.

This is undoubtedly a close case. However, having carefully considered the legislative purpose and the *Walker* line of cases, we are convinced that the defendant's conduct falls within the statute. We have also examined the other issues raised by the defendant and find them to be without merit. The judgment of the district court is AFFIRMED.

---

**5.** One possible distinction is that in the case of the newly created account the physical instruments sent in interstate commerce, i. e., the defendant's own personal checks for that account, are direct proceeds of the stolen funds. The defendant would not have had possession of those instruments if he had not opened the account with the stolen funds. In the case of a pre-existing account the defendant already has legitimate possession of the physical instruments that move in interstate commerce. However, once the drawee bank uses the proceeds of the fraudulently obtained funds to pay the interstate checks, as the bank necessarily must have done in the instant case, it becomes clear that the defendant has used his checks to transfer the proceeds from one state to another in violation of the statute.