UNITED STATES of America,
Plaintiff-Appellee,

v.

Joseph R. LENNON,
Defendant-Appellant.

No. 86–2175.

United States Court of Appeals,
Fifth Circuit.

March 31, 1987.

Olney G. Wallis, Michael A. Maness, Houston, Tex., for defendant-appellant.

Henry K. Oncken, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., Stephen P. Learned, Washington, D.C., for plaintiff-appellee.

Before WILLIAMS, JOLLY and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Joseph R. Lennon appeals his conviction for having violated the National Stolen Property Act. 18 U.S.C. § 2314. We affirm.

### I.

The facts of this case were fully developed in Lennon's first appeal, *United States v. Lennon,* 751 F.2d 737 (5th Cir. 1985), but we will briefly summarize them here. Joseph R. Lennon was the manager of crude oil supply for Charter International Oil Company (Charter). Lennon controlled Charter's purchases of crude oil, and he directed the company to make periodic purchases from Southwest Petrochem, Inc. (Petrochem), owned by Milton Jones. In return for arranging these purchases, Lennon extracted a kickback from Jones varying in price from $.10 to $.20 per barrel purchased. Lennon instructed Jones to pay the kickback to either H & L Enterprises or Harlen Trading Company, companies owned fifty percent by Lennon and fifty percent by his business partner, James Harrigan. In one instance, Jones paid a kickback to Lennon's sole proprietorship named LATCO. The evidence indicated that the kickbacks totaled $1,193,000.

Lennon was charged in an eight-count indictment with causing the interstate transportation of certain checks knowing that certain proceeds of each check were obtained by fraud in violation of the National Stolen Property Act. 18 U.S.C. §§ 2314, 2(b). The proof at trial showed that the checks from Charter to Petrochem traveled in interstate commerce while the kickbacks from Jones to Lennon's companies did not. The government's theory focused on the Charter checks themselves, and sought to prove that the amount of each check was inflated by the amount of the kickback Jones would ultimately pay to Lennon's companies.

In 1983, a jury convicted Lennon on all counts in a trial before the Honorable Carl O. Bue, Jr. The court fined Lennon $70,000 and sentenced him to serve four years in prison. We reversed Lennon's conviction because of an erroneous jury instruction, *Lennon,* 751 F.2d at 743–44, and the case was retried. The district court amended its jury instructions to conform to our

previous panel opinion. The jury convicted Lennon and he was given the same sentence. This appeal followed.

## II.

The crux of Lennon's defense is that his activities do not fall within the narrow strictures of the National Stolen Property Act. The Act imposes criminal penalties on anyone who:

> transports in interstate ... commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing *the same* to have been stolen, converted or taken by fraud.

18 U.S.C. § 2314 (emphasis added). Lennon argues for a strict interpretation of the statute's requirement that what is transported in interstate commerce be "the same" as what is "taken by fraud."

In the instant case, the items transported in interstate commerce were securities, in the form of checks, that were drawn by Charter and made payable to Petrochem. The amount of each Charter check was fraudulently inflated by Lennon in order to finance the ultimate kickback from Jones to Lennon's companies.[1] Each Charter check therefore contained both legitimate funds designed to pay for crude oil and fraudulently obtained funds designed to finance kickbacks. Although each Charter check traveled in interstate commerce, only the kickback portion of each Charter check was "taken by fraud";[2] the remainder was legitimately used to purchase crude oil. Lennon therefore argues that the Act does not apply because each Charter check that traveled in interstate commerce was not precisely "the same" as the kickback portion of the check that was "taken by fraud." We refuse to adopt such a narrow interpretation of the Act.

Lennon principally relies on *Dowling v. United States*, 473 U.S. 207, 215, 105 S.Ct. 3127, 3132, 87 L.Ed.2d 152, 159 (1985), in which the Supreme Court reversed a convic-

---

1. We reject the contention that the evidence was insufficient for the jury to conclude that Lennon knew the Charter checks were inflated to contain at least $5,000 in fraudulently obtained funds before they traveled interstate. The government established that Jones agreed to pay Lennon a kickback before the Charter checks were issued and sent interstate. Jones and Lennon initially agreed to the kickback arrangement in 1974, approximately four years before the first Charter check named in the indictment traveled interstate. Based on the number of kickbacks Lennon received from Jones during that period of time, the jury was entitled to conclude that Lennon knew that the issuance of each Charter check would result in a kickback from Jones to Lennon's companies. Jones' testimony verifies that the Charter checks must have been inflated to accommodate the increased costs of providing a kickback to Lennon.

   Q. Now, Mr. Jones, during this time period, '77 to '79 that we've covered by these documents in front of you, I want to ask you this question: would you have been willing to sell crude oil to Charter on the following terms: During this time period in lieu of paying the commission to H & L or Harlen or Latco, to have reduced your sales price to Charter by the amount of that commission. Would you have been willing to sell on that basis?
   A. Yes, I would have. I would have sold crude oil to Charter almost at any price.
   [R. Vol. 11, p. 67.]

2. This theory of the case derives from our previous panel opinion. Lennon's original convic-

tion was reversed by the previous panel because of an erroneous jury instruction on the elements of Section 2314. *United States v. Lennon*, 751 F.2d 737 (5th Cir.1985). The district court instructed the jury that one element of the offense was "that such checks had a value in excess of $5,000." *Id.* at 743. The statute requires that the fraudulently obtained property transported in interstate commerce exceed $5,000 in value. 18 U.S.C. § 2314; *United States v. Lennon*, 751 F.2d at 744. The government argued that the instruction was correct because the checks themselves were taken by fraud and therefore the jurisdictional amount was properly satisfied in reference to the face value of each check. *Lennon*, 751 F.2d at 743. The panel rejected the government's argument and reversed, holding that it was impermissible that "the jury could have found that the checks from Charter to Petrochem exceeded $5,000 ... and that some amount out of each larger check, possibly less than $5,000, was obtained by fraud." *Id.* at 744. The panel opinion held, *sub silentio*, that only the kickback portion of each Charter check was taken by fraud. *Id.* at 743–44. On remand, the district court amended the jury instructions on the elements of the offense to require that "such checks *contained* at least $5,000 in funds, which were taken by fraud." (emphasis added). We believe this instruction cured the error identified by the prior panel opinion, and correctly focused the government's theory in the second trial on the value of the kickback portion of each check.

tion under Section 2314 for the interstate shipment of bootleg sound recordings and motion pictures whose unauthorized distribution infringed valid copyrights. Dowling's section 2314 conviction rested on his unauthorized use of the copyrights, not on any allegation that he unlawfully possessed their physical embodiment in sound recordings and motion pictures. *Id.* at 215 n. 7, 105 S.Ct. at 3132 n. 7, 87 L.Ed.2d at 159 n. 7. The Court reversed the conviction because "Congress had no intention to reach copyright infringement when it enacted § 2314." *Id.* at 226, 105 S.Ct. at 3138, 87 L.Ed.2d at 166.

Lennon cites *Dowling* for a different proposition. To support his argument that the kickback portion of each Charter check was not "the same" as the checks themselves, Lennon cites the following passage from *Dowling:*

> The courts interpreting § 2314 have never required, of course, that the items stolen and transported remain in entirely unaltered form. Nor does it matter that the item owes a major portion of its value to an intangible component. But these cases and others prosecuted under § 2314 have always involved *physical* "goods, wares, [or] merchandise" that have themselves been "stolen, converted or taken by fraud." This basic element comports with the commonsense meaning of the statutory language: by requiring that the "goods, wares, [or] merchandise" be "the same" as those "stolen, converted or taken by fraud," the provision seems clearly to contemplate a *physical identity* between the items unlawfully obtained and those eventually transported, and hence some prior *physical* taking of the subject goods.

*Id.* at 216, 105 S.Ct. at 3133, 87 L.Ed.2d at 159–60 (citations omitted) (emphasis added). Lennon argues that his conviction should be reversed because there is no "physical

identity" between the checks that traveled in interstate commerce and the kickback portion that was "taken by fraud." We disagree for two reasons.

First, we interpret the Court's admonition that the statute contemplates "a physical identity between the items unlawfully obtained and those eventually transported" as distinguishing intangible rights, such as copyright, from the physical items the statute seeks to regulate, such as goods, wares, merchandise, securities or money.[3] The instant case presents no such question of coverage. On the contrary, the statute expressly reaches "securities," the definition of which indisputably includes the Charter checks at issue.

Second, the Court explicitly refused to address the issue before us: the degree of "sameness" the statute requires between what is transported in interstate commerce and what is "taken by fraud." The Court expressly declined to consider the issue when the government in *Dowling* offered to show that "the wrongfully obtained tapes which contained the musical material should be considered 'the same' as the phonorecords onto which the sounds were transferred...." *Id.* at 215 n. 7, 105 S.Ct. at 3132 n. 7, 87 L.Ed.2d at 159 n. 7. *Dowling* is therefore distinguishable and does not control the instant case.

In the instant case, the jury was entitled to find that the funds that were transported in interstate commerce were "the same" as those that were "taken by fraud." The government introduced extensive evidence that the Charter checks were the source of the kickbacks. The fraud occurred at the time the checks were sent from Charter to Petrochem because that is when Lennon inflated the amount of each Charter check in order to finance the ultimate kickback from Jones to Lennon's companies. The district court properly instructed the jury

---

3. For example, on the same page as the above-quoted passage, the Court explains that "the property rights of a copyright holder have a character distinct from the *possessory* interest of the owner of simple 'goods, wares, [or] merchandise'...." *Dowling*, 473 U.S. at 217, 105 S.Ct. at 3133, 87 L.Ed.2d at 160 (emphasis added). Likewise, the Court questions whether the act of stealing a copyright "comfortably fits the terms associated with *physical* removal employed by § 2314. The infringer invades a statutorily defined province guaranteed to the copyright holder alone. But he does not assume *physical* control over the copyright...." *Id.* (emphasis added).

that one element of the offense was that each Charter check "contained at least $5,000 in funds, which were taken by fraud." The jury was entitled to find that each Charter check not only contained legitimate funds designed to purchase crude oil, but also contained at least $5,000 in fraudulently obtained funds designed to finance kickbacks. The issue therefore reduces to whether the Act's requirement of "sameness" is satisfied even though both legitimate and illegitimate funds traveled interstate while commingled in the form of each check. We hold that it is.

We are persuaded that this case is controlled by *United States v. Levy*, 579 F.2d 1332, 1336 (5th Cir.1978). The defendant in *Levy* engaged in a scheme where he took by fraud a check for $160,324 from the Alison Mortgage Company. *Id.* at 1333–34. The fraudulently obtained check was deposited in a Lafayette, Louisiana bank account, controlled by the defendant. *Id.* at 1333. The Lafayette bank account contained approximately $27,000 in legitimate funds that were not taken by fraud.[4] *Id.* at 1337. The defendant drew two checks on the account, one for $45,000 and one for $55,000. *Id.* at 1333. The two checks were then sent across state lines and were deposited in a bank in Beaumont, Texas. *Id.* The court upheld the section 2314 conviction, reasoning that the two checks that traveled interstate must have contained at least $5,000 in fraudulently obtained funds because there were not enough legitimate funds in the Lafayette bank account to cover either of the interstate checks. *Id.* at 1336–37. The court explained that there was "no doubt that the two checks sent to Beaumont *represented* the funds illegally acquired from Alison." *Id.* at 1337 (emphasis added).

*Levy* teaches that we may look behind the form of an interstate check in order to scrutinize the funds it represents. The conviction was upheld in *Levy* because each check that traveled interstate must have represented at least $5,000 of funds that were "taken by fraud." *Levy* also teaches that it is not an impediment to conviction that the interstate checks may have contained at least some legitimate funds commingled with the funds that were "taken by fraud." By upholding the section 2314 conviction, the court in *Levy* inevitably found that the interstate checks were "the same" as the funds that were "taken by fraud." It was sufficient for a conviction under Section 2314 that the checks contained at least $5,000 in fraudulently obtained funds regardless of what portion, if any, represented legitimate funds.

By comparison, the instant case is much simpler. The government introduced evidence at trial that Lennon inflated the amount of each interstate Charter check in order to finance kickbacks. The jury was entitled to find that each check contained at least $5,000 in fraudulently obtained funds. As in *Levy*, it is no impediment to conviction that the fraudulently obtained funds were commingled in an interstate check with legitimate funds. It is sufficient that the Charter checks contained at least $5,000 in fraudulently obtained funds regardless of what portion represented legitimate funds. *See also United States v. Moore*, 571 F.2d 154, 157–58 (3rd Cir.), *cert. denied*, 435 U.S. 956, 98 S.Ct. 1589, 55 L.Ed.2d 808 (1978) (counterfeit tickets held to be "the same" as stolen blank ticket stock).

Our holding is bolstered by the policy implications of a contrary result. Lennon seeks to reverse his conviction because the funds that were taken by fraud were commingled in a check with other legitimate funds. The logical extension of Lennon's argument is that a defendant charged with violating section 2314 could escape conviction simply by proving that at least one dollar of the interstate check was sent in return for valid consideration. Congress could not have intended such a result.

### III.

Lennon's only remaining argument worthy of discussion is based on an alleged

---

4. *Levy* does not explain whether these legitimate funds were present at the time the fraudulently obtained check was deposited. *Levy*, 579 F.2d at 1337. The opinion states only that the Lafay-ette bank account contained approximately $27,-000 in legitimate funds "at the time the two checks sent to Beaumont were returned to the Lafayette bank for final payment." *Id.*

defect in his indictment. Lennon's attack focuses on paragraph No. 9 of count one which reads:

> On or about February 3, 1978, within the Southern District of Texas, the defendant, JOSEPH R. LENNON, for the purpose of executing the aforesaid *scheme and artifice to defraud* and for obtaining money and property in excess of $5,000 by means of false and fraudulent pretenses did transport and cause to be transported in interstate commerce Charter check number 22691 in the amount of $2,419,620.00 made payable to Southwest Petrochem in that he caused it to be transported from Houston, Texas, to Jacksonville, Florida, knowing that certain proceeds of the check to have been taken by fraud.

Lennon argues that the indictment is defective because it includes the phrase "scheme and artifice to defraud" which derives from the second paragraph of 18 U.S.C. § 2314. Lennon was convicted of violating the first paragraph of 18 U.S.C. § 2314 which penalizes anyone who transports in interstate commerce any securities of the value of $5,000 or more knowing the same to have been taken by fraud. 18 U.S.C. § 2314. Lennon argues that the indictment must therefore fall because it impermissibly creates a "hybrid" offense of paragraphs one and two while the conviction was based only on paragraph one of section 2314.

While we agree that the indictment was inartfully drawn, the inclusion of the phrase "scheme and artifice to defraud" does not make the indictment defective. Lennon's conviction is properly based on his having "taken by fraud" the kickback portion of each Charter check. The inclusion of the phrase "scheme and artifice to defraud" was mere surplusage and was meant only to elaborate the nature of Lennon's fraudulent activity. *United States v. Hughes,* 766 F.2d 875, 879 (5th Cir.1985). We therefore uphold the district court's determination that the indictment was not defective.

The judgment of the district court is therefore

AFFIRMED.