**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 91-1112
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

SIMON EDWARD HEATH and PAUL SAU-KI CHENG,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Texas

_____
(August 20, 1992)

Before HIGGINBOTHAM and DUHÉ, Circuit Judges and HUNTER, District Judge.[1]

DUHÉ, Circuit Judge:

Defendants-Appellants Simon Heath and Paul Cheng were convicted of numerous counts of bank fraud, wire fraud, misapplication of funds, false entries, and interstate transportation of funds obtained by fraud.  They seek reversal of their convictions.  Because we find two counts of the indictment multiplicitous, we remand in part.  The remaining convictions are affirmed.

**BACKGROUND**

Cheng and Heath were founding partners of Pacific Realty Corporation (PRC), a large national real estate development

_____

[1] Senior District Judge of the Western District of Louisiana, sitting by designation.

company.  In 1984, PRC and Cheng and Heath, individually, acquired Guaranty Federal Savings & Loan, a Dallas savings and loan then in receivership.  The purchase agreement contained a forbearance clause exempting Guaranty from banking regulations that prohibit loans to insiders.  Thus, Guaranty was authorized to loan money to PRC and its clients.

Soon after acquiring Guaranty, PRC bought forty-two acres of land in Florida for development.  Problems occurred, however, when the local government imposed a sewer moratorium.  At the same time, the company with which PRC had planned to develop the land withdrew from the deal.  Cheng and Heath then tried to sell the land, but were unsuccessful.

In December 1985, Cheng and Heath made a deal with Don Farris, of the Don Companies, an Arizona real estate development company.  Farris, a major borrower at Guaranty, was to buy almost thirty acres of the Florida property for $10 million with money loaned to him by Guaranty.  The loan would be non-recourse and collateralized solely by the Florida property.  Farris would then establish a $2 million reserve account to pay interest on the loan, funded with proceeds from the sale to PRC of property he owned in Arizona.   PRC agreed to buy the Arizona property with $3.3 million loaned to it by Guaranty and secured solely by the property.

The $10 million loan from Guaranty to Farris required a loan-to-property value ratio of ninety percent.  For the deal to be successful, therefore, the Florida property had to be

2

appraised at $11 million, more than twice the value quoted to Cheng and Heath during their earlier unsuccessful attempts to sell the property. In an effort to obtain such a favorable appraisal, Heath, in the presence of Cheng and another PRC employee, directed Ben Romero, an officer of PRC, to secure an appraisal on an "as built basis" by informing the appraisers that twin highrise apartment towers would be built on the land. At the time, Cheng and Heath had no intention of actually building the highrises. Based on this misrepresentation, Romero obtained a preliminary opinion letter from Marshall & Stevens, a Chicago appraisal firm, appraising the full 42.40 acres at $11.2 million. Marshall & Stevens was not aware that its preliminary letter was going to be used to close the Guaranty/Farris loans, and the letter was technically deficient for such purposes. Using this letter, however, PRC and Farris closed the deal on January 17, 1986. On January 18, at Cheng and Heath's request, Marshall & Stevens sent PRC a corrected back dated letter, addressed to Guaranty and appraising only the thirty acres of property sold to Farris.

Although it corrected its original letter, Marshall & Stevens did not immediately provide Guaranty with the necessary full narrative appraisal because it was unable to verify its initial $11.2 million estimate. In light of the zoning laws and sewer moratorium, one Marshall & Stevens's appraiser suggested that the Florida property was worth less than half of the $11.2 million evaluation. In the meantime, in March 1986, the Federal

3

Home Loan Bank (FHLB) discovered that the loan had been made without the required full narrative appraisal.

To provide Marshall & Stevens with a factual basis for the $11.2 million figure, Romero made to them specific false representations about the development potential of the Florida property, including assurances that sewer and treatment facilities were available, that the density of the purported twin towers was permissible under current zoning, and that it was physically possible to build the highrises on the land. Based on these misrepresentations, Marshall & Stevens completed the full narrative appraisal for $11.2 million.

For their participation in the scheme, the Government brought a seventeen count indictment against Cheng and Heath. Count one alleged conspiracy, counts two and three alleged bank fraud based on the loans for $10 million and $3 million procured from Guaranty. Counts four through seven alleged wire fraud, misapplication of funds, and false entries. The final ten counts were for interstate transportation of funds obtained by fraud, based on Cheng and Heath's use of funds obtained through the Florida deal to purchase stock from a New York broker.

**ANALYSIS**

Together, the Defendants attack their convictions on many grounds. Initially, they charge that the indictment was multiplicitous with regard to the two bank fraud charges stemming from a single transaction. Next they attack the sufficiency of the evidence on all counts, asserting that the evidence did not

4

support the finding of fraud necessary to each count.  They also claim that their convictions for interstate transportation of fraudulently obtained funds fail because the Government did not prove that each individual transfer involved proceeds of a fraudulent transaction.  Finally, they cite numerous trial errors, including prosecutorial misconduct, mistakes in the district court's evidentiary rulings, and flaws in the district court's instructions to the jury.

## I.    Indictment Multiplicity

"'Multiplicity' is charging a single offense in more than one count of an indictment."  United States v. Lemons, 941 F.2d 309, 317 (5th Cir. 1991).  The Defendants argue that Counts 2 and 3 of their indictments, which charged them with bank fraud under 18 U.S.C. § 1344, are multiplicitous in that each of the counts seeks to punish them for participation in the same scheme against Guaranty.  The Government counters that each transaction, the $3.3 million Phoenix loan and the $10 million Florida loan, must be viewed as subjecting Guaranty to separate risks of loss, giving rise to multiple liability under the statute.

In Lemons, we stated that "the bank fraud statute imposes punishment only for each execution of the scheme."  Id. at 318.  Thus, unlike the mail or wire fraud statues, the bank fraud statute does not allow punishment for each act in execution of a scheme or artifice to defraud.  Id.  Although we so interpreted the bank fraud statute, we expressly declined to hold that "the execution of a scheme cannot result in the imposition of multiple

5

liability . . . . <u>Id.</u> n.6. Our note specifically referred to <u>United States v. Farmigoni</u>, 934 F.2d 63 (5th Cir. 1991), <u>cert. denied</u>, 112 S. Ct. 1160 (1992). <u>Farmigoni</u>, in contrast to this case and <u>Lemons</u>, involved a scheme to defraud two different banks, giving rise to prosecution in each of the banks' home states. Although both indictments in <u>Farmigoni</u> arose from the same scheme, "neither require[d] proof of intent to defraud the other unnamed financial institution." <u>Id.</u> at 66. The instant scheme involves intent to defraud only one bank, Guaranty, albeit by procuring two loans. The two loans, however, were integrally related; one could not have succeeded without the other. Indeed, the sale of the Phoenix property was conceived for the sole purpose of facilitating the Florida sale.

Although a two-loan scheme may subject an institution to greater risk than a scheme involving only one transaction, it is the execution of the scheme itself that subjects a defendant to criminal liability, not, as we stated in <u>Lemmons</u>, the execution of each step or transaction in furtherance of the scheme. Because the Defendants' indictments sought to punish them for execution of the multiple steps involved in the scheme, the counts are multiplicitous. Therefore, we remand the case with the instruction to the Government to choose the count it wishes to leave in effect. The district court then should vacate the convictions on the remaining count and resentence Heath and Cheng. <u>See</u> <u>United States v. Saks</u>, 964 F.2d 1514, 1526 (5th Cir. 1992); <u>United States v. Moody</u>, 923 F.2d 341, 347-48 (5th Cir.),

6

cert. denied, 112 S. Ct. 80 (1991).

II.  Sufficiency of the Evidence

Convictions must be affirmed if the evidence, viewed in the light most favorable to the verdict, with all reasonable inferences and credibility choices made in support of it, is such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Kim, 884 F.2d 189, 192 (5th Cir. 1989).  In making this determination, we need not exclude every reasonable hypothesis of innocence. United States v. Henry, 849 F.2d 1534, 1536 (5th Cir. 1988). Juries are free to use their common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life when giving effect to the inferences that may reasonably be drawn from the evidence.  United States v. Cruz-Valdez, 773 F.2d 1541, 1546-47 (11th Cir. 1985) (en banc), cert. denied, 475 U.S. 1049 (1986).

A.  Fraud

Each of the fraud-based charges relies on the twin highrise apartment tower statement used in the Marshall & Stevens appraisal.  The Defendants contend that the statement was not a material misrepresentation and, therefore, could not support their convictions.  They suggest that representations that should have no effect on the party to whom they are made, no matter how intentional, cannot be material.  In other words, because Marshall & Stevens had a professional duty to independently

investigate the highest and best use of the Florida land, the owners' plans for development could not influence the appraisal, and, therefore, are immaterial to the appraisal.

The Government responds that despite the appraisers' ethical duty, the twin tower statement was made with the intent to influence the appraisal and did, in fact, do just that.  Implicit in the highrise description, the Government argues, is a representation of density per acre.  This particular physical plan, the Government explains, was the only one that could sustain the density supporting the valuation, as well as zoning requirements, such as parking and green spaces.

A statement is material if it "has a natural tendency to influence, or was capable of influencing the decision of" the lending institution.  Kungys v. United States, 485 U.S. 759, 770 (1988); Theron v. United States Marshal, 832 F.2d 492, 496-97 (9th Cir. 1987), cert. denied, 486 U.S. 1059 (1988).  The highrise misrepresentation was necessary to the $11.2 million appraisal which, in turn, was necessary to PRC's procuring the loan from Guaranty.  We conclude, therefore, that the statement was material to Guaranty's decision.  Proof that Romero made the misrepresentations at Heath and Cheng's bequest, therefore, was sufficient to support their fraud-based convictions.

B.    Individual Transfers

The Defendants argue that their convictions for interstate transportation of funds obtained by fraud should be reversed because the Government failed to prove beyond a reasonable doubt

8

that any individual transfer involved the proceeds of the illegal deal. The proceeds of the fraudulent transaction were commingled with over $700,000 of untainted money. Because none of the transfers named in the indictment exceeded $700,000, the Defendants contend, none necessarily involved funds obtained by fraud. In the aggregate, the transfers listed in the indictment well exceeded $700,000.

In United States v. Poole, 557 F.2d 531 (5th Cir. 1977), we reversed a defendant's conviction for interstate transportation of funds obtained by fraud because his account contained enough untainted funds to pay the check in question without using the funds obtained fraudulently. Id. at 535-36. We noted specifically, however, that we were not confronted with the issue present here, that is, the situation in which there are insufficient untainted funds to cover all the checks in question. Id. at 536 n.8.

In United States v. Levy, 579 F.2d 1332 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979), we addressed that question, affirming the defendant's conviction although he had mingled legitimately obtained funds with those obtained by fraud. Levy differs from the instant case, however, in that each check written exceeded the amount of clean funds. Id. at 1334, 1337.

The Defendants, focussing on each transfer in isolation, insist that Poole, not Levy, applies because there were clean funds sufficient to cover each transfer. To view each transaction in isolation, however, would defeat the purposes of

9

the statute, allowing sophisticated criminals "to spirit stolen funds from one state to another," Levy, 579 F.2d at 1337, so long as each check written did not exceed the amount of legitimate funds on hand in the bank account.  "[A] criminal statute should be fairly construed in accordance with the legislative purpose behind its enactment." Levy, 579 F.2d at 1337 (citing United States v. Turley, 352 U.S. 407 (1957)).  We thus decline to extend Poole to the case at hand.

The Government established that Heath and Cheng deposited $6,053,204.93 of loan proceeds into an account containing $454,518.49 of untainted funds.  In that account, the Defendants placed an additional $332,162.50 of clean funds, and the bank contributed interest totalling $12,600.56.  Thus, the Government proved that between January 21, 1986 and February 25, 1986, the account held $6,053,204.93 tainted funds and $799,281.55 clean funds (counting all of the interest paid as clean).  By February 4, the date of the first transfer cited in the indictment, the Defendants had reduced the account balance to $3,988,519.  From this amount, they transferred a total of $2,155,508 to a New York broker.  Even assuming that none of the clean funds were removed before February 4, it is obvious that the $799,281.55 could not have covered all of the transfers to New York.  At least $1,356,126.45 in tainted funds was transferred to New York.  It defies logic to require that the Government trace these tainted funds through each transfer.  Such proof is impossible because money is fungible.  United States v. Banco Cafetero Panama, 797

F.2d 1154, 1158 (2d Cir. 1986). The impossibility of such proof, however, does not render the convictions invalid. We are satisfied that, having proved beyond a reasonable doubt that the aggregate taken from the account exceeded the amount of clean funds available, the Government met its burden.

Moreover, we are unpersuaded by Defendant Cheng's contentions that the Government failed to prove that he had knowledge of the transfers. Viewed in the light most favorable to the verdict, the evidence established that Cheng oversaw the financial affairs of PRC and was aware of the stock purchases. In this light, the evidence permits the inference that he understood how those purchases would be paid for.

III. Trial Errors

A.   Prosecutorial Misconduct

During the trial, the Government questioned several witnesses about the use of the Florida property following the sale to Farris. The Defendants contend that these questions exceeded the limits imposed by the district court on testimony regarding the status of the land after the closing. The Government notes, however, that the district court limited testimony regarding only the value of the Florida property, not all subjects having to do with it. It argues that its questions were relevant to show the control exercised over the property by the Defendants and their continued efforts to develop and sell the property to prove that the sale to Farris was a sham warehousing transaction.

The trial court specifically restricted testimony regarding the value of the property to a six month period surrounding closing. The court, however, declined to adopt a similar rule for evidence of development, deciding instead to rule on such evidence on a case-by-case basis. Nonetheless, the court requested that the Government not ask open-ended questions of the witnesses on that subject. After careful review of the Government's questions, we find no violation of the guidelines set by the district court.

The Defendants next argue that the prosecutors tainted the trial by deliberately eliciting inflammatory hearsay statements from Scott Smith, Vice President and Senior Loan Officer of Guaranty during redirect examination by the Government. During Smith's cross-examination, the Defendants inquired whether the Florida loan had aroused Smith's attention in any way. On redirect, the Government pursued this line of questioning, asking whether Smith had reported the loan to any of his senior officers. Smith testified, "I told Mr. Thompson that there was some concern being voiced about the loan, that it may be a sham loan to get money into Pacific Realty." Defense counsel immediately objected, and the court retired the jury. When the jurors returned, they were instructed to ignore the last of Smith's statements because it was hearsay.

We disagree with the district court's description of the statements. Hearsay "is a statement, other than one made by the declarant while testifying at trial or hearing, offered to prove

12

the truth of the matter asserted." Fed. R. Evid. 801(c).
Smith's statement was not offered to show that the loan was a
sham, but to reveal whether the loan had aroused his suspicions
and whether Smith had notified any other bank officer about it.
It was not hearsay, and its introduction, therefore, did not
constitute reversible error.    Finally, the Defendants
complain that several statements made by the prosecutor in
closing argument were wholly frivolous and prejudicial.
Specifically, the Defendants point to several instances when the
prosecutor allegedly vouched for a Government witness.  They also
refer to the prosecutor's remarks about the Defendants' failure
to explain the twin tower concept.  And, last, the Defendants
allege that the prosecutor implied that they should be punished
for violations of civil regulations as well as criminal statutes.
We find none of these arguments persuasive.

The Government's remarks about Mr. Kuhn's testimony merely
pointed out that the Defendants' attacks on his credibility were
unsuccessful.  The statements do not rise to the level of
vouching, most often described by this Court as "explicit
personal assurances of the witnesses veracity." United States v.
Binker, 795 F.2d 1218, 1224 (5th Cir. 1986), cert. denied, 479
U.S. 1085 (1987).  The Government's references in rebuttal to the
Defendants' failure to explain the twin tower concept similarly
identified holes in the Defendants' defense theory, in this
instance, by pinpointing a weakness in their evidence.  Finally,
a review of the record does not reveal an attempt by the

13

prosecutor to imply that violations of civil regulations should lead the jury to punish the Defendants. Rather, the prosecutor's unspecific reference to "rules and regulation" was made as part of an expansive illustration of the Defendants' general disrespect for the law.

B.    Evidentiary Rulings

1.    Kuhn Testimony

The trial court limited the testimony of one of the Defendants' allegedly key witnesses, Michael Kuhn, a real estate lawyer, who would have testified about the use of non-recourse loans to execute real estate deals. The trial court limited the testimony because Kuhn would be "testifying to his own experience and impressions," leaving the Government no means to question his accuracy. The court further stated that Kuhn's testimony on the subject was impermissible because "there [were] no partial studies, no statistics from which would give rise to any reliable inferences. No testing the accuracy of the witness's opinion."

Rule 702 of the Federal Rules of Evidence permits one "qualified as an expert by knowledge, skill, experience, training, or education" to testify when his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact issue." Fed. R. Evid. 702. As a general rule, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than the admissibility and should be left for the jury's consideration." Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th

14

Cir. 1987). We find that in light of these rules, the limitation of Kuhn's testimony was in error. Kuhn had specialized knowledge and experience in the field of real estate closings, which were beyond the knowledge and skills of the jurors. The absence of scientific data supporting his opinions went to the weight the jury should have accorded them. The error, however, was harmless.

Information about non-recourse loans was available from other witnesses. The limitation of Mr. Kuhn's testimony, therefore, did not so hamper the Defendants' ability to present their defense as to mandate reversal of their convictions.

2. Romero Rehabilitation

The Defendants wished to examine Michael Carnes, the lawyer representing Ben Romero, a key participant in the appraisal scheme. The Defendants proffered Carnes in an attempt to rehabilitate Romero's credibility, which the Government had attacked by introducing prior inconsistent statements made by Romero before the grand jury following his plea agreement with the Government. Carnes was to testify about the tactics used by the Government allegedly to coerce Romero into pleading guilty. The district court, however, correctly excluded Carnes's testimony because it was not probative of Romero's inconsistencies or impeachment.

Rule 613(b) of the Federal Rules of Evidence requires that a witness be "afforded an opportunity to explain or deny" inconsistent statements proven by extrinsic evidence. It does

15

not mandate the examination of corroborating witnesses.  To the contrary, it is within the trial court's broad discretion to set reasonable limits on rehabilitative testimony to prevent the trial from meandering off into collateral matters.  Beck v. United States, 317 F.2d 865, 870 (5th Cir. 1963), cert. denied, 376 U.S. 972 (1964).

    C.   Instructions

       1.  Allen Charges

After the jury deliberated for seven days, it informed the court that it was deadlocked.  The court then read the jury an Allen charge[2], but, over counsel's objections, omitted from the charge language that the court believed coercive.  In particular, the district court omitted language encouraging the "majority" and "minority" to reconsider their positions.  It also failed to repeat that the jury should not convict unless convinced of the Defendants guilt beyond a reasonable doubt.  The first omission, the Defendants argue, had a coercive effect on the jury.  The second eliminated an essential reminder about the Government's burden of proof.

We review Allen charges for compliance with two requirements:  "'(1) the semantic deviation from approved Allen charges cannot be so prejudicial as to require reversal, and (2) the circumstances surrounding the giving of an approved Allen charge must not be coercive.'"  United States v. Lindell, 881

---

[2]  "Allen" refers to Allen v. United States, 164 U.S. 492 (1896). The term describes supplemental instructions urging jurors to forego their differences and reach a unanimous verdict.

F.2d 1313, 1321 (5th Cir. 1989) (quoting United States v. Bottom, 638 F.2d 781, 787 (5th Cir. Unit B Mar. 1981)), cert. denied, 493 U.S. 1087 and 496 U.S. 926 (1990).  The district court is given broad discretion to determine whether an Allen charge might coerce a jury.  United States v. Reeves, 892 F.2d 1223, 1229 (5th Cir. 1990).

In light of the complexity of the case, the sophistication of the bank fraud scheme, and the length of the indictment, the court did not err in giving the jury an Allen charge rather than declaring a mistrial.  See Lindell, 881 F.2d at 1321.  Although the court deviated from the Fifth Circuit's suggested Allen charge, the modification was not so significant as to coerce the jury to reach its verdict.  Although the court did not address the jurors in terms of majority and minority, it did properly instruct all of them to reconsider their opinions, but not to "surrender a conscientiously held conviction merely to reach a verdict."  The Defendants' contention that the jury's continued deliberation is proof of the coercive effect of the instruction does not convince us otherwise.  We note, in fact, that the jury's verdict was a discriminating one -- after further deliberation, the jury remained deadlocked on two counts and acquitted the Defendants of several others.

Nor do we find omission of the reasonable doubt language to be reversible error.  The jury was reminded at least thirty-fives times in the court's final jury charges that the Government had to prove the elements of the crimes beyond a reasonable doubt.

17

It also was informed of this burden of proof during jury selection and closing arguments.  Additionally, the court provided the jurors with a written copy of the final charges during deliberations.  In light of these constant reminders of the Government's burden, we conclude that the omission of the reasonable doubt language from the Allen charge does not require the reversal of the Defendants' convictions.

   2. Literal Truth

The Defendants claim that they were entitled to a charge instructing the jury that if the appraisal represented the literal truth, they could not be found guilty of making false entries for the purposes of 18 U.S.C. § 1006.  The underlying foundation of the Defendants' argument, however, misconstrues the law.  "The prohibition of false entries by [section 1006] is in broad and comprehensive terms."  United States v. Meyer, 266 F.2d 747, 754 (5th Cir.), cert. denied, 361 U.S. 875 (1959).  Mr. Justice Cardozo, in describing 12 U.S.C. § 592, a forerunner of the modern bank fraud statutes, defined false entries to include "any entry on the books of the [institution] which is intentionally made to represent what is not true or does not exist, with the intent to deceive [the institution's] officers or to defraud the association."  United States v. Darby, 289 U.S. 224, 226 (1933) (quoting Agnew v. United States, 165 U.S. 36, 52 (1897)).

The appraisal entered by Cheng and Heath on the Guaranty books was prepared by professional appraisers and revealed the

18

false assumptions on which it is based, but its purpose was to represent to Guaranty that the Florida property was worth $11.2 million because highrise apartment towers would be built on it. That representation is not true; the plan to build the highrise towers did not exist at the time the appraisal was entered. The entry of the appraisal based on knowingly false assumptions with the intent to defraud Guaranty falls well within the terms of section 1006. The court, therefore, did not err in rejecting the "literal truth" instruction proffered by the defense.

### 3. Good Faith Defense

After lengthy discussions about the Defendants' request for an instruction explaining their good faith defense, the court instructed the jury that "one who acts with honest intent is not chargeable with intent to defraud." The Defendants contend that the word "chargeable" as used in the instruction eliminated their entire defense, in effect telling the jury that the Defendants could not have acted in good faith because they in fact had been "charged" with the offenses.

The Government notes that despite the debate in the trial court surrounding this instruction, the Defendants did not raise this point of error. A party may not state one ground when objecting to an instruction and attempt to rely on a different ground for the objection on appeal. 9 Charles A. Wright and Arthur Miller, § 2554 at 647; Palmer v. Hoffman, 318 U.S. 109, 119 (1943). Our review of this claim, therefore, is limited to plain error.

19

Although subject to the interpretation now suggested by the Defendants, it is not obvious to us that the word "chargeable" in the present context would so confuse the jurors. Inartful as the court's choice of words may have been, it does not rise to the level of plain error.

### 4. Expansion of the Indictment

The Defendants next object that the court's instructions regarding false entry and misapplication of funds permitted the jury to find them guilty for acts not charged in the indictment. First, they argue that because the indictment referred to the Defendants as officers, directors, and shareholders only, the court erred when it instructed the jury that the Defendants were responsible for their actions as "officer[s], agent[s], or employee[s] of or connected in any capacity with" the institution. The Defendants objected to the instruction in the district court, but they did not do so on the ground that the instruction expanded the indictment. Thus, we review for plain error only.

The trial court's instruction does not amount to plain error. The court first read the indictment, referring to the Defendants as officers, directors, and shareholders of Guaranty. It then read the applicable statutes to the jury, both of which apply to "officer[s], agent[s], or employee[s] of or connected in any capacity with" the institution. 18 U.S.C. §§ 657 & 1006. Then the court listed the elements of the offenses, repeating, as the first element of each, the requirement that the Defendants be

20

"officer[s], agent[s] or employee[s]."

To the extent that the instructions mandated this finding, they were unnecessary because the parties had stipulated that the Defendants were directors of Guaranty. Though superfluous, the instructions did not expand the indictment to allow the jury to convict the Defendants for actions taken in a capacity other than officer or director.

The Defendants next contest the court's charge regarding materiality. They argue that by instructing the jury that entry of the appraisal was material, rather than that the false highrise statement was material, it permitted the jury to convict them based on any false statement contained in the appraisal, whether made by them or not. The Defendants properly objected on these grounds in the district court.

We review a jury instruction to determine whether "'the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" United States v. Stacey, 896 F.2d 75, 77 (5th Cir. 1990) (quoting United States v. August, 835 F.2d 76, 77 (5th Cir. 1987)). "A trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented." United States v. Pool, 660 F.2d 547, 558 (5th Cir. Unit B Nov. 1981).

The court's instruction on false entries properly advised the jury of the charges pending against the Defendants and the elements of those crimes. The potential for confusion arising from the

21

court's reference to materiality does not negate this finding. The court specifically instructed that the indictment charged only the highrise statement to Defendants. S.R. 33, p. 55. We are satisfied, therefore, that as a whole, the instruction fairly and adequately informed the jury of the pertinent issues.

### 5. Clean Funds

The Defendants finally claim that they were entitled to a charge that if there were untainted funds in their account sufficient to cover each of the alleged interstate transfers, then the jury should find the Defendants not guilty of interstate transfer of funds obtained by fraud. As the discussion above explains, supra II. B., this requested instruction does not accurately reflect the law.


**CONCLUSION**

Because counts 2 and 3 of the Defendants' indictments are multiplicitous, we REMAND the case for dismissal of one count and resentencing. The remaining convictions are AFFIRMED.

REMANDED WITH INSTRUCTIONS and AFFIRMED IN PART.


22