UNITED STATES of America,
Plaintiff–Appellee,

v.

Carlos QUINTANILLA and Leticia
Gutierrez, Defendants–
Appellants.

Nos. 91–2223, 91–2224.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 28, 1993.

Decided Aug. 20, 1993.

Barry R. Elden, Asst. U.S. Atty., Kathleen T. Murdock, Asst. U.S. Atty., argued, Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee in Nos. 91-2223 and 91–2224.

Nan R. Nolan, argued, Robinson, Curley & Clayton, Kenneth G. Mason, Chicago, IL, for defendant-appellant in No. 91–2223.

Robert S. Bailey, argued, Chicago, IL, for defendant-appellant in No. 91–2224.

Before RIPPLE and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

KANNE, Circuit Judge.

This case involves a scheme to defraud the G. Heileman Brewing Company through the submission of false funding proposals to the company's corporate sponsorship program. Carlos Quintanilla and Leticia Gutierrez, two participants in the scam, were convicted of conspiring to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and of transporting stolen property in interstate commerce, 18 U.S.C. §§ 2 and 2314. In addition, Gutierrez was convicted of money laundering, 18 U.S.C. § 1956(a)(1)(A) and (B)(i), conspiracy to defraud the IRS, 18 U.S.C. §§ 2 and 371, and failure to file income tax returns, 26 U.S.C. § 7203. The defendants appeal their convictions, alleging assorted errors. We affirm.

## I.

As part of its marketing strategy, G. Heileman Brewing Company of Wisconsin operates a nationwide corporate sponsorship program. Under the program, Heileman funds activities, such as sporting events and neighborhood festivals, at which it can advertise and promote its various brands of beer. Organizations seeking Heileman's financial assistance must submit proposals describing the event to be sponsored with a request for the necessary funds. The funds awarded under the program are to be used exclusively for the proposed event.

In 1983, Heileman made Joseph Monreal its Director of Hispanic Market Development. As part of his job, Monreal screened proposals for corporate sponsorship funds and made preliminary recommendations. At the time, Monreal, who lived in Milwaukee, was romantically involved with Leticia Gutierrez, the assistant manager and administrator of the Mexico Medical Center in Chicago.

In late summer 1983, Monreal devised a scheme to defraud Heileman using the corporate sponsorship program. Gutierrez agreed to help him. Monreal approached officials of several Chicago-area Hispanic organizations, persuading them to allow Gutierrez to draft proposals on behalf of their groups. Once the proposals were submitted to Heileman, Monreal would recommend they be funded. In return, the officials would kick back a portion of the award to Monreal. Gutierrez cashed the kickback checks.

Carlos Quintanilla, who had met Monreal in 1982, was the founder and executive director of Operation Search, a not-for-profit community organization providing employment services to low and moderate income residents in the Westtown and Humboldt Park communities of Chicago. Quintanilla joined Monreal's scheme; in return for favorable recommendations on proposals submitted on behalf of Operation Search, Quintanilla would give Monreal a cut of the award.

From 1983 to 1987, in addition to the Operation Search proposals, Monreal and Gutierrez drafted and submitted fraudulent funding requests for seven other community organizations in the Chicago area. Some proposals inflated the amount requested; others sought funding for nonexistent events. As a result of Monreal's scheme, Heileman authorized expenditures totalling $693,964. Of this amount, Monreal pocketed $295,054. Through Operation Search, which he controlled, Quintanilla received $175,000. Gutierrez received $38,000, and obtained another $12,400 for certain friends of hers.

Gutierrez's relationship with Monreal turned sour and, in June 1986, she informed Heileman's General Counsel about Monreal's scheme. The matter was eventually referred to the Office of the United States Attorney for the Northern District of Illinois and, from late 1986 to May 1990, Gutierrez cooperated with the Assistant United States Attorneys ("AUSAs") investigating Monreal.[1] In 1987, Gutierrez made monitored phone calls to Monreal, and wore a concealed electronic recording device during conversations with

---

1. The government disputes these time periods. It contends the Monreal investigation was not referred to the United States District Attorney's Office until June 1987. Our decision does not depend on the resolution of this dispute.

him. She also produced copies of relevant documents.

In August 1987, AUSA Scott Mendeloff issued a subpoena directing Gutierrez to appear before a federal grand jury impanelled to investigate Monreal's doings. She was advised of her right to counsel, and consulted Patrick Reilly, an attorney with whom she had previously worked on a Hispanic community project to build a soccer stadium. Reilly called Mendeloff to ask if Gutierrez would receive immunity in exchange for her cooperation in the investigation. Mendeloff told Reilly that no immunity would be granted, indicating that Gutierrez had admitted to her participation in the scheme and that her signature was on all the kickback checks. Mendeloff further stated that he was prepared to indict, convict, and, if necessary, immunize Gutierrez at a later date in order to obtain testimony against other participants.

Reilly then asked Mendeloff if the government would consider granting Gutierrez immunity if it were able to convict "the big fish." Mendeloff's notes of the conversation indicate he told Reilly that, in such a situation, he did not know what the government would do, adding that it "may not prosecute [Gutierrez], but probably would have to." The conversation ended with Mendeloff saying that he would inform the sentencing court of "every iota of [her] cooperation." In a second phone call that day, Reilly told Mendeloff that he had consulted with Gutierrez, who had decided to continue cooperating with the authorities because "she doesn't have much choice." Mendeloff replied that he would do what he could for her, iterating that he would inform the court "in great detail" of her cooperation.

In November 1987, Gutierrez phoned Mendeloff, stating that she was upset over the case and had contemplated suicide. She asked if conversations with her doctor were privileged. Mendeloff advised her that he was not her attorney, and explained that conversations with her doctor were privileged as long as she did not disclose the contents to others. Gutierrez subsequently continued to cooperate with the AUSA without obtaining counsel.

In April 1990, Gutierrez was served with a second grand jury subpoena. The next month she met with Mendeloff to review a draft of a grand jury statement prepared by the AUSA and based on Gutierrez's previous statements about the scheme to defraud Heileman as well as documents she had provided. Gutierrez was also presented with a draft of a plea agreement pertaining to charges against her being considered by the grand jury. When she asked what would happen to her, Gutierrez was told that "in all likelihood the government would charge her with crimes," but that her cooperation would be made known to the sentencing court. Gutierrez said that perhaps she should get a lawyer; Mendeloff offered to obtain one for her and called the Federal Defender's Office. Mendeloff gave Gutierrez the name of the attorney on duty at the Defender's Office and told her she could go downstairs to see him. Gutierrez subsequently indicated that she did not think she would get a lawyer, stating, "I did wrong and I knew I did wrong from the beginning." As she left Mendeloff's office, Gutierrez stated that she would continue to cooperate and "see what happens." She never testified before the grand jury.

In September 1990, the grand jury issued a four count indictment listing Monreal and Quintanilla as defendants. The next month, the grand jury returned a forty count superseding indictment that added Gutierrez as a defendant. Monreal pleaded guilty to RICO conspiracy and eventually testified against Quintanilla and Gutierrez. Gutierrez filed a pre-trial motion to dismiss the indictment or, in the alternative, for a hearing under *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to determine whether the indictment was tainted by the improper use of statements she believed should be immunized. The district court denied the motion. *United States v. Quintanilla*, 760 F.Supp. 687, 694–96 (N.D.Ill.1991).

The case proceeded to trial, and the jury convicted Quintanilla and Gutierrez of the aforementioned crimes. The district court sentenced each defendant to six months in prison on the RICO conspiracy count, and five years of probation on each remaining

count.[2] Both defendants timely appealed their convictions.

## II.

*Carlos Quintanilla*

■ Quintanilla challenges his convictions on five counts of interstate transportation of stolen property ("ITSP") under the National Stolen Property Act, 18 U.S.C. § 2314, and for conspiracy to violate RICO, 18 U.S.C. § 1962(d). According to his first argument, his ITSP convictions should be reversed because the government amended the indictment during trial, thus depriving him of his Fifth and Sixth Amendment rights.[3] We recount the events necessary to address this claim.

After some of the counts charged in the superseding indictment had been severed on motion by the defendants, Quintanilla went to trial on charges of RICO conspiracy, mail and wire fraud, interstate transportation of funds obtained by fraud, and conspiracy to defraud the IRS. At the close of the government's case-in-chief, the district court granted Quintanilla's motion for judgment of acquittal on the mail fraud count (Count Four) and the wire fraud count. The government voluntarily dismissed as multiplicitous five of the ITSP counts. Then, after the defense had rested but before the jury was instructed, the government, over objection by Quin-

tanilla's counsel, deleted the severed counts from the indictment and amended other counts that referred to the severed counts. The jury thus had a redacted version of the superseding indictment during its deliberations.

■ Quintanilla argues that the government materially revised the indictment, in violation of the settled rule that "an indictment may not be amended except by resubmission to the grand jury, unless the change is merely a matter of form." *Russell v. United States*, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). *See also Leichtnam*, 948 F.2d at 376; *United States v. Field*, 875 F.2d 130, 133 (7th Cir.1989). An indictment is amended when the charging terms "are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Auerbach*, 913 F.2d 407, 413 (7th Cir.1990). Specifically, Quintanilla claims that the government altered the intent element required for a violation of the ITSP statute. The ITSP counts in the original superseding indictment incorporated by reference the allegations of the mail fraud scheme charged in Count Four.[4] After judgment of acquittal was granted as to Count Four, the ITSP counts were amended to remove any reference to Count Four or the scheme to defraud charged in that count.[5]

---

**2.** For both defendants, the probation sentences were to run consecutive to the term of imprisonment and concurrent to one another.

**3.** The Fifth Amendment guarantees that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury...." "[I]t follows that felony charges must be framed by a grand jury and that a defendant may be tried for a felony only on the charges the grand jury approved, as it approved them, and no others." *United States v. Leichtnam*, 948 F.2d 370, 376 (7th Cir.1991). The Sixth Amendment ensures the right of a criminal defendant "to be informed of the nature and cause of the accusation" against him.

**4.** For example, Count Five stated:

The SPECIAL APRIL 1990 GRAND JURY further charges:
1. The SPECIAL APRIL 1990 GRAND JURY realleges and incorporates by reference paragraphs One through Thirty–Eight of Count

Four of this indictment as though fully set forth herein.
2. On or about September 19, 1985, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

CARLOS QUINTANILLA and JOSEPH MONREAL

defendants herein, having devised the scheme to defraud and to obtain money set forth in Count Four and for the purpose of executing that fraud scheme, knowingly caused a check from Operation Search in the amount of $8,552.00, payable to Daniel Martinez and representing funds obtained by fraud from Heileman, to be transported in interstate commerce, that is: from Milwaukee, Wisconsin to Chicago, Illinois;

In violation of Title 18, United States Code, Sections 2 and 2314.

**5.** Thus, for example, the amended Count Five stated:

The SPECIAL APRIL 1990 GRAND JURY further charges:

Thus, Quintanilla submits, the ITSP counts in the original indictment required the government to prove that the transportation of stolen property was committed in furtherance of a scheme to defraud. According to Quintanilla, the amended ITSP counts contained no such element, "leaving an ambiguity as to the intent charged" in each of those counts.

In short, Quintanilla contends that the amendment of the indictment prejudiced his defense. He argues that the government's entire case for the ITSP counts was based upon the premise that the kickback checks transported in interstate commerce were "in furtherance of a scheme to defraud." Quintanilla's defense "was predicated on an attempt to rebut the crime as it was charged in the indictment, *i.e.* an attempt to show that there was no scheme to defraud [Heileman] in which Quintanilla participated." By removing any reference to such a scheme in the redacted ITSP counts, the government improperly altered the elements of the charged offense. In so doing, Quintanilla claims, the government deprived him of his constitutional right to notice of the charges against him so that he could prepare a defense.

The government responds that a scheme to defraud is not an element of the ITSP crime with which Quintanilla was charged. The ITSP counts in the superseding indictment included a reference to the scheme to defraud alleged in Count Four simply to provide detail as to how money was taken by fraud from Heileman. Thus, according to the government, the deletion of any reference to Count Four did not alter the intent element required to violate the ITSP statute, but only changed the form of the indictment in response to the district court's granting of Quintanilla's motion for acquittal.

We begin with some brief general principles. This court has long recognized that Fed.R.Crim.P. 52(a), which provides that

"[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded," applies fully when judging the sufficiency of an indictment. *United States v. Roman*, 728 F.2d 846, 849–50 (7th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984). This is consistent with the view expressed by the Supreme Court in *Russell*:

> "This Court has, in recent years, upheld many convictions in the face of questions concerning the sufficiency of the charging papers. Convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused. [Citing cases.] This has been a salutary development in the criminal law."

369 U.S. at 763, 82 S.Ct. at 1046 (quoting *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 996, 3 L.Ed.2d 1041 (1959)).

We do not think the amendments made by the government altered the intent element of the ITSP statute, 18 U.S.C. § 2314. "To support a conviction under section 2314, an indictment must allege: '(1) interstate transportation of a stolen, converted, or fraudulently taken check of at least $5,000 value (2) with fraudulent intent.'" *United States v. Johnson*, 805 F.2d 753, 758 (7th Cir.1986) (quoting *United States v. Mosley*, 786 F.2d 1330, 1334 (7th Cir.), *cert. denied*, 476 U.S. 1184, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986)). *See also United States v. James*, 923 F.2d 1261, 1266 (7th Cir.1991). Participation in an unlawful scheme to defraud is not an essential element of the offense. *See Johnson*, 805 F.2d at 758; *Mosley*, 786 F.2d at 1334–35; *United States v. Mastrandrea*, 942 F.2d 1291, 1294 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 973, 117 L.Ed.2d 138 (1992); *United States v. Grainger*, 701 F.2d 308, 310 (4th Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307 (1983); *Johnson v. United States*, 207 F.2d 314, 319

---

On or about September 19, 1985, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

CARLOS QUINTANILLA and JOSEPH MON-REAL

defendants herein, knowingly caused a check from Operation Search in the amount of $8,552.00, payable to Daniel Martinez and representing funds obtained by fraud from Heileman, to be transported in interstate commerce, that is: from Milwaukee, Wisconsin to Chicago, Illinois;

In violation of Title 18, United States Code, Sections 2 and 2314.

(5th Cir.1953), *cert. denied,* 347 U.S. 938, 74 S.Ct. 632, 98 L.Ed. 1087 (1954).[6]

> As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime....
>
> ... A part of the indictment unnecessary to and independent of the allegations of the offense proved may normally be treated as a "useless averment" that "may be ignored."

*United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) (quoting *Ford v. United States,* 273 U.S. 593, 602, 47 S.Ct. 531, 534, 71 L.Ed. 793 (1927)). *See also Mastrandrea,* 942 F.2d at 1293 ("Allegations in an indictment that are not necessary to establish a violation of the statute in issue are mere surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime.").

We agree with the government that the reference in the ITSP counts to the scheme to defraud alleged in Count Four was mere surplusage meant only to elaborate the nature of Quintanilla's fraudulent activity. *See United States v. Lennon,* 814 F.2d 185, 190 (5th Cir.), *cert. denied,* 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 254 (1987). "[A]mendments to an indictment will be allowed to stand if they do not 'change an 'essential' or 'material' element of the indictment so as to cause prejudice to the defendant.'" *Field,* 875 F.2d at 133 (quoting *United States v. Cina,* 699 F.2d 853, 857 (7th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983)). The amendment of the ITSP counts falls into this category.

Contrary to Quintanilla's assertion, his case bears little resemblance to *Leichtnam,* 948 F.2d at 379–81, in which we reversed the defendant's conviction because the evidence presented by the government at trial broadened the possible bases of conviction set out in the indictment. Leichtnam was charged with one count of "having 'knowingly use[d] and carr[ied] a firearm: to wit, a Mossberg rifle,'" while trafficking in drugs. *Id.* at 374. At trial, the jury was shown three guns, the Mossberg and two handguns, and was later instructed that it could convict if convinced that Leichtnam had used "'a firearm'—in effect any one of the three." *Id.* at 379. We found that the introduction of the handguns, together with the jury instruction, impermissibly amended the indictment, thereby violating Leichtnam's Fifth Amendment right to be tried only on the charges contained in his indictment. *Id.* at 379–81.

Our opinion emphasized that the government could have originally drafted the firearm count to charge Leichtnam with possession or use of "a firearm," but that the decision to make the Mossberg rifle an essential element of the crime was a deliberate one. *Id.* at 380. Indeed, the AUSA who drafted the indictment and tried the case informed this court at oral argument that he purposefully did not charge the two handguns introduced at trial because of a dearth of evidence that those guns had been used or carried during a drug deal. *Id.* The combination of the narrowly drafted indictment, the government's intentional introduction at trial of the handguns it did not charge, and the instruction allowing the jury to convict Leichtnam of having used or carried any one of those guns required us to reverse the firearm conviction. *Id.* at 380–81.

In the case before us, we cannot say that the government made the scheme to defraud set forth in Count Four the centerpiece of the ITSP counts. A firearm (any firearm will do) is an essential element of the firearm statute, 18 U.S.C. § 924(c); as noted, however, a scheme to defraud is not essential to the crime of transporting checks taken by fraud in interstate commerce. The deletion of the reference to Count Four's scheme to defraud in the ITSP counts thus cannot be said to

---

**6.** The second paragraph of § 2314 requires a "scheme or artifice to defraud," but outlaws the transportation of a person or persons in interstate commerce (and, after November 29, 1990, foreign commerce) "in the execution or concealment of a scheme or artifice to defraud" that person or persons. This provision thus applies only to the interstate transportation of people, not property. *Mastrandrea,* 942 F.2d at 1294. Quintanilla does not contend he was charged under this paragraph.

have broadened the basis of Quintanilla's liability on those counts. *Leichtnam* thus does little to aid our analysis of Quintanilla's claims.

Rather, we find the ITSP counts, as originally set forth in the superseding indictment, to be indistinguishable from the ITSP count at issue in *Mastrandrea.* There, the government's charge stated:

> On or about January 10, 1986, in the State and District of Minnesota and elsewhere, the defendants,

> KENNETH R. MASTRANDREA
> and MILTON H. SARGENT

> each aiding and abetting the other, for the purpose of executing the aforesaid scheme and artifice to defraud, did knowingly cause to be transported in interstate commerce, through normal banking channels, Firstours' check number 22194 in the amount of $5,000 drawn on the Security Pacific National Bank of Los Angeles, California, which check was deposited in an account in the name of Kenneth R. Mastrandrea at the Norwest Bank Metrowest, Hopkins, Minnesota, all in violation of Title 18, United States Code, Sections 2314 and 2.

942 F.2d at 1292–93.

Relying on the reference to a scheme to defraud, Mastrandrea claimed that the wording of the indictment led him to believe that he had been charged under the second paragraph of § 2314, which, he contended, required proof that the illicit interstate transportation was in furtherance of a scheme to defraud. *Id.* at 1293. Like Quintanilla, Mastrandrea asserted that the indictment failed to give him adequate notice of the charges against him so that he could prepare his defense. *Id.*

The Eighth Circuit rejected Mastrandrea's argument, holding that "the interstate transportation of fraudulently obtained checks for the purpose of executing a scheme to defraud

is not an element of the offense, and the inclusion of this language in the indictment does not make it an element of the offense." *Id.* at 1294. The court went on to conclude that Mastrandrea had not been prejudiced by the surplusage in the indictment. *Id.* See also *Lennon*, 814 F.2d at 190. We believe the same result should obtain in the case before us. Because a scheme to defraud is not an element of § 2314, the deletion of all references to a scheme to defraud did not prejudice Quintanilla's Fifth or Sixth Amendment rights.

■ Finally, Quintanilla's argument that the government's action deprived him of notice of the ITSP charges against him is severely flawed. The district court acquitted Quintanilla on Count Four *before* the defense had presented its case to the jury. (The indictment, on the other hand, was not amended until *after* the defense had rested.) Quintanilla knew that the mail fraud count had been severed before he began his defense; consequently, he should have known that he would have to defend against the ITSP counts independently of the scheme to defraud Heileman alleged in Count Four.

■ Quintanilla argues, for the first time on appeal, that the redacted ITSP counts did not clearly allege that he knew the funds he helped transport had been taken by fraud, an element of a § 2314 offense. Having argued that the government charged too much by including a reference to a scheme to defraud, Quintanilla now contends that the government left too little once it amended the indictment, in effect failing to allege fraudulent intent.[7] By not presenting this argument to the district court, however, Quintanilla waived it. We will reverse based on this issue only if we find plain error, Fed. R.Crim.P. 52(b), which is to say an error that must be corrected in order to avert a miscarriage of justice. *United States v. Caputo*, 978 F.2d 972, 974 (7th Cir.1992).

---

7. This argument is not particularly well received. Having complained that the ITSP counts, as originally drafted, alleged a scheme to defraud Heileman, Quintanilla cannot plausibly argue that, under the redacted version of the same counts, he was unaware that the government was charging him with transporting checks he knew to represent the proceeds of fraud. However, because the jury took an amended version of the superseding indictment to the jury room, we will consider the sufficiency of the ITSP counts in that indictment.

There is no plain error here. "In determining whether the essential elements of the offense are sufficiently stated, it is not necessary that any particular words or phrases be used, nor is it necessary that the indictment track the exact language of the statute as long as each element of the offense is alleged in a form which substantially states it." *United States v. Lowe*, 860 F.2d 1370, 1373 (7th Cir.1988) (citations omitted), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989). Title 18 U.S.C. § 2314 prohibits one from transporting, in interstate or foreign commerce, "any ... money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." The ITSP counts charged either that Quintanilla "knowingly caused" a check "representing funds obtained by fraud from Heileman[ ] to be transported in interstate commerce," or that he "knowingly caused a check obtained by fraud from Heileman ... to be transported in interstate commerce".[8] We believe these counts, given a complete and objective reading, adequately informed Quintanilla that, in order to violate the statute, he had to know the transported checks represented fraudulently obtained funds.

In *United States v. Clemmons*, 892 F.2d 1153 (3d Cir.1989), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2623, 110 L.Ed.2d 644 (1990), the Third Circuit rejected an argument nearly identical to the one advanced by Quintanilla. In that case, the indictment charging Clemmons alleged that

> he did knowingly sell ... stolen United States Treasury Bonds, ... said stolen bonds having an aggregate value in excess of $500 ... [in] violation of Title 18 United States Code, Section 510(b).

*Id.* at 1158 (alteration in original). Section 510(b) provides, in part:

> "[w]hoever, with the knowledge that such Treasury check or bond ... is stolen ... buys, sells, exchanges, receives, delivers, retains or conceals any such Treasury check or bond ... that in fact is stolen ... shall be fined not more than $10,000 or

imprisoned for not more than 10 years, or both."

*Id.*

Clemmons argued that he understood the phrase "knowingly sell stolen bonds" in the indictment to mean that he was cognizant only of the sale, not that the bonds were stolen. For this reason, he claimed the indictment failed to inform him of an essential element of the offense. *Id.* at 1158–59. The Third Circuit disagreed, finding that Clemmons's reading of the indictment was "unduly crabbed." According to the court, "an objective reader would understand from the charging document that the grand jury found probable cause to believe that Clemmons sold bonds he knew were stolen." *Id.* at 1159.

Our conclusion that no plain error occurred in this case is also supported by a reading of the indictment as a whole. *See Johnson*, 805 F.2d at 759 n. 11; *United States v. Watkins*, 709 F.2d 475, 478 (7th Cir.1983). Paragraph Five of Count One of the redacted indictment alleged, in part:

> It was further a part of the conspiracy that defendants CARLOS QUINTANILLA, JOSEPH MONREAL and LETICIA GUTIERREZ, did knowingly and willfully transport and cause to be transported in interstate commerce *money taken by fraud from Heileman, that is, checks drawn to Operation Search and checks and cash kicked back to defendants JOSEPH MONREAL and LETICIA GUTIERREZ, which checks and cash represented funds defendants obtained by false and fraudulent pretenses, representations, and promises, well knowing at the time that the pretenses, representations, and promises would be and were false when made* ... (emphasis added).

Moreover, the district court instructed the jury that to find Quintanilla guilty of the ITSP counts, it must find that "at the time the defendant caused the check or funds described in the particular count to be transported or transmitted[,] he knew it had been taken by fraud."

---

**8.** Count Seventeen involved a slight variation. That count charged that Quintanilla "knowingly caused a check obtained by fraud from Operation

Search ... and representing funds obtained by fraud from Heileman[ ] to be transported in interstate commerce".

Finally, the redacted ITSP counts sufficiently alleged the other elements of the offense. Each count cited the statute Quintanilla was accused of violating; the reference in each count to transportation of property (i.e., checks) having a value greater than $5,000 indicated that the charge was brought under the first paragraph of § 2314. *Cf. United States v. Sloan,* 939 F.2d 499, 501–02 (7th Cir.1991) (legally sufficient indictment cited tax evasion statute defendant was accused of violating), *cert. denied,* — U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992). In addition, each count set forth the date, the source of the funds, the amount of the check, the payee, and the points of origin and destination. We conclude that the amended ITSP counts sufficiently charged a violation of 18 U.S.C. § 2314.

■ In a final attempt to obtain reversal of his ITSP convictions, Quintanilla claims that under § 2314 there must be a physical identity between the funds obtained by fraud and those transported in interstate commerce. According to Quintanilla, because the government "offered only one theory of prosecution"—that the checks were transported as part of a scheme to defraud Heileman—his defense was prejudiced because he was unable to argue that the Heileman funds sent to Operation Search had been commingled with other Search funds before being transported in interstate commerce. Quintanilla bottoms his argument on *United States v. Poole,* 557 F.2d 531 (5th Cir.1977), suggesting that there may have been sufficient surplus funds in the Operation Search bank account to cover the amounts kicked back to Monreal without applying the proceeds of funds fraudulently obtained from Heileman. According to Quintanilla, if the checks sent to Monreal were drawn on legitimate Search funds, then no funds taken by fraud from Heileman were transported in interstate commerce, and his convictions under § 2314 cannot stand. *See id.* at 535–36.

We fail to see how the government's "theory of prosecution" prevented Quintanilla from defending against the ITSP charges on any ground his counsel saw fit to argue. The suggestion that the amendment of the indictment somehow precluded Quintanilla from raising a commingling defense is a non-starter. As we previously pointed out, the district court granted Quintanilla's motion of acquittal on Count Four after the government had rested. At that time, Quintanilla's counsel knew that his possible defense theories were not limited to rebutting the overarching scheme alleged in that count. Thus, his failure to raise an objection to the ITSP counts based on the rationale of *Poole* waived that argument. We review for plain error.

Two of the five ITSP counts of which Quintanilla was convicted involved Heileman checks payable to Operation Search and transported from Milwaukee to Chicago. Quintanilla's commingling argument is not a defense to the transportation of these checks because the crime occurred before the checks were deposited into Operation Search's bank account. As for the other three counts, § 2314 does not require that the precise item stolen, converted, or taken by fraud be transported in interstate commerce; it is sufficient if the item transported is directly derived from the property stolen, converted, or obtained by fraud. *See, e.g., United States v. Cardall,* 885 F.2d 656, 674 (10th Cir.1989); *United States v. Morgan,* 805 F.2d 1372, 1377–78 (9th Cir.1986), *cert. denied,* 480 U.S. 949, 107 S.Ct. 1612, 94 L.Ed.2d 797 (1987). *See also Lennon,* 814 F.2d at 189; *United States v. Levy,* 579 F.2d 1332, 1337 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1243, 59 L.Ed.2d 471 (1979); *United States v. Pomponio,* 558 F.2d 1172, 1174–75 (4th Cir. 1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1233, 55 L.Ed.2d 761 (1978); *Poole,* 557 F.2d at 535; *United States v. Walker,* 176 F.2d 564, 566 (2d Cir.), *cert. denied,* 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547 (1949).

The evidence at trial showed, and Quintanilla does not dispute, that he agreed to pay Monreal a portion of every Heileman grant that Operation Search received. Accordingly, the ultimate source of the funds used to pay Monreal was Heileman. The evidence also showed that Quintanilla followed Monreal's directions concerning exactly how the kickbacks were to be made;[9] there is no

---

9. For instance, Monreal requested that kickback checks be written for less than $10,000 in order

suggestion that these directions were not followed to the last detail. Given the nexus between the Heileman grants and the kickbacks made to Monreal, we do no think that § 2314 liability hinges in this case on whether or not Operation Search had sufficient clean funds in its bank account each time a kickback check was drawn and transported across state lines to Monreal.

"[A] criminal statute should be fairly construed in accordance with the legislative purpose behind its enactment." *Levy,* 579 F.2d at 1337. The Supreme Court addressed the purpose of § 2314 in *United States v. Sheridan:*

> Congress had in mind preventing further frauds or the completion of frauds partially executed. But it also contemplated coming to the aid of the states in detecting and punishing criminals whose offenses are complete under state law, but who utilize the channels of interstate commerce to make a successful get away and thus make the state's detecting and punitive processes impotent. This was indeed one of the most effective ways of preventing further frauds as well as irrevocable completion of partially executed ones.

329 U.S. 379, 384, 67 S.Ct. 332, 335, 91 L.Ed. 359 (1946) (footnote omitted).

We think that Quintanilla's actions are wholly within the range of conduct Congress sought to criminalize in enacting § 2314. Looking to the substance of Quintanilla's conduct, it is apparent that the checks he caused to be transported in interstate commerce represented, and were directly derived from, fraudulently obtained Heileman funds. Our conclusion is reinforced by considering the effects of a contrary ruling. If Quintanilla's conduct falls outside the ambit of § 2314 simply because the fraudulently obtained money was laundered through Operation Search's bank account, "sophisticated crimi-

nals will be able to spirit stolen funds from one state to another through the use of checking accounts and thereby: (1) remain immune from federal criminal laws; and (2) remove the proceeds of their wrongdoing from the jurisdiction of the state where the offense took place." *Levy,* 579 F.2d at 1337. We conclude that Quintanilla's commingling argument does not demonstrate plain error. His ITSP convictions will therefore stand.

### III.

Quintanilla also challenges his conviction for RICO conspiracy on three grounds. First, he argues that Count One charged multiple conspiracies. Alternatively (as best we can tell), he contends that, if Count One alleged only a single conspiracy, then a fatal variance exists between the racketeering conspiracy charged and the proof adduced at trial. Finally, he makes a brief but unavailing reference to misjoinder of offenses in the indictment. We begin by describing relevant portions of the procedural history of this case.

■ The superseding indictment can be described charitably as a convoluted tangle of alleged frauds, some of which involved Monreal, Quintanilla (through Operation Search) and Leticia Gutierrez, others of which involved Monreal, Gutierrez, and various different organizations. As originally drafted, Count One of the superseding indictment identified Operation Search as the enterprise under 18 U.S.C. § 1961(4), and charged Quintanilla, Monreal, and Gutierrez, as persons associated with Operation Search, with conspiring to conduct the affairs of that organization through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). According to Count One, the racketeering activity consisted of various racketeering acts set forth in Count Two.[10] That count, in

---

to avoid bank reporting requirements when the checks were cashed. As the kickback for every fraudulent Operation Search proposal exceeded $10,000, Monreal would be paid back in several checks, each for less than that amount. At trial, Monreal testified that, on occasion, he would direct Quintanilla to make checks payable to, among others, Gutierrez or MVP Awards, a sporting goods store operated by Monreal and his family.

10. Paragraph Four of the superseding indictment, as originally drafted, states:

It was further a part of the conspiracy that defendants CARLOS QUINTANILLA, JOSEPH MONREAL and LETICIA GUTIERREZ knowingly devised and intended to devise a scheme and artifice to defraud Heileman and to obtain money from Heileman by means of false and fraudulent pretenses, representations, and

turn, charged Quintanilla with substantive RICO violations, *id.* § 1962(c), and listed a total of twelve frauds as predicate acts. *See id.* § 1961(1) and (5).

Six of the frauds alleged in Count Two were associated with Operation Search (the "Search frauds") and involved all three defendants.[11] These frauds included several acts of ITSP and one act of wire fraud.[12] The remaining six frauds alleged in Count Two involved funds Quintanilla received from the City of Chicago under the Job Training Partnership Act (the "JTPA frauds"). The JTPA frauds consisted of six acts of mail fraud.[13]

Prior to trial, Quintanilla moved to dismiss Count One on the ground that it charged multiple conspiracies. Specifically, Quintanilla argued that six of the predicate acts incorporated in Count One by reference to Count Two (the Search frauds) involved all three defendants, but the last six predicate acts (the JTPA frauds) involved only Quintanilla. The district court denied the motion but severed the allegations related to the JTPA frauds. As a result, the RICO conspiracy alleged in Count One consisted of only the six Search Frauds.[14]

Still other counts in the superseding indictment mentioned frauds not associated with Operation Search or Quintanilla (the "non-Search frauds"). These frauds involved proposals submitted by Monreal and Gutierrez on behalf of five organizations (Caballaros De San Juan, LIGA Hispanoamerica de Fut–Bol, the Minnie Minoso Sports Foundation, the International Amateur Soccer League, and P.O.D.E.R.).[15] The non-Search frauds were alleged in various counts charging the interstate transportation of stolen property, 18 U.S.C. § 2314 (charging Monreal and Gutierrez), money laundering, 18 U.S.C. § 1956(a)(1)(A) and (B)(i) (charging Gutierrez), and conspiracy to defraud the IRS, 18 U.S.C. §§ 2 and 371 (charging Quintanilla, Monreal, and Gutierrez).

Count Four of the superseding indictment charged Quintanilla, Monreal, and Gutierrez with using the postal service as part of a scheme to defraud Heileman, in violation of 18 U.S.C. § 1341. The allegations of various frauds included the six Search frauds as well

---

promises, well knowing at the time that the pretenses, representations, and promises would be and were false when made, which scheme was in substance as set forth in Counts Two and Four through Twenty–One and is incorporated by reference herein.

We do not believe this isolated reference to Count Four can reasonably be interpreted to mean that Count One alleged the non-Search frauds listed in Count Four as predicate acts. If anything, the reference was intended to reallege the Search frauds listed in Count Four and no others.

This is a case in which the government needs to be reminded, however, that the desire to be "inclusive" in an indictment is a poor substitute for careful drafting. Through its ability to draft the indictment, the government "is the master of the scope of the charged RICO conspiracy." *United States v. Neapolitan,* 791 F.2d 489, 501 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986). Of course, the ability to define the conspiracy carries with it the responsibility of proving what is specifically alleged.

11. Five of the alleged frauds consisted of fraudulent proposals submitted for, and on behalf of, Operation Search; the sixth consisted of two bogus proposals sent to Heileman on behalf of the Chicago Latin American Soccer Association ("CLASA") and the Liga Centroamericana de Foot Ball ("LIGA"). These proposals were submitted under the aegis of Operation Search, accompanied by a cover letter bearing Quintanilla's name and explaining that CLASA and LIGA fell within his organization's umbrella. Heileman accepted the proposals and issued a single check to Operation Search.

12. As previously mentioned, the district court granted Quintanilla's motion of acquittal on the wire fraud count (Count Nineteen) at the close of the government's case. When the government amended the indictment, it deleted the reference to wire fraud and Count Nineteen in Count One.

13. Prior to trial, the district court ordered that Quintanilla be tried separately on Count Two and Counts Twenty-seven through Forty, all of which pertained to the JTPA frauds. Accordingly, these counts were severed. After the defendants had been sentenced, the government moved to dismiss all remaining counts that had previously been severed. The district court granted the motion.

14. As amended, Count One listed the Search frauds that had been previously alleged in Count Two.

15. A total of ten fraudulent proposals were submitted to Heileman on behalf of these organizations.

as the non-Search frauds. As previously mentioned, after the government presented its case at trial, the district court granted Quintanilla's motion for a judgment of acquittal on Count Four. The district court, relying on *United States v. Camiel*, 689 F.2d 31 (3d Cir.1982), concluded that a variance existed between the one overarching scheme alleged in Count Four and the evidence produced by the government. Specifically, the court found that the government's evidence demonstrated the existence of multiple schemes to defraud Heileman, some of which involved Quintanilla, Monreal, and Gutierrez as defendants, others of which involved only Monreal and Gutierrez.[16]

Quintanilla's claim that Count One alleged multiple conspiracies is meritless. "[A] RICO conspiracy requires only an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity [i.e., two acts of racketeering activity within at least ten years of each other]." *Neapolitan*, 791 F.2d at 498. Count One specifically alleged that Quintanilla, Monreal, and Gutierrez agreed to conduct the enterprise of Operation Search through a pattern of racketeering activity, to wit, the six Search frauds. We conclude that the indictment did not allege multiple conspiracies.

Alternatively, Quintanilla seems to suggest that, for the reason he was acquitted on Count Four, his conviction on Count One should be reversed. That is, he contends that evidence of the non-Search frauds alleged in that Count (as well as other counts) was admitted against him to prove the RICO conspiracy alleged in Count One. In fact, he argues, according to the government's theory of the case, the RICO conspiracy consisted of the Search and non-Search frauds. Because the non-Search frauds were not charged (via Count Two) as predicate acts in Count One, Quintanilla insists that a material variance exists between the conspiracy charged and the government's proof at trial, requiring reversal of his conviction.

As should be clear by now, Count One and Count Four were not coextensive. Count One alleged only the Search frauds as predicate acts; Count Four alleged both Search and non-Search frauds. That the district court concluded the government had presented insufficient evidence to show Quintanilla participated in the mail fraud scheme alleged in Count Four did not preclude the jury from finding Quintanilla guilty of the conspiracy alleged in Count One. With this in mind, we turn, albeit briefly, to Quintanilla's argument that a variance exists between Count One of the superseding indictment and the government's proof at trial.

A conspiracy variance claim "amounts to a challenge to the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991). It is well settled that, even if the evidence presented at trial arguably established multiple conspiracies, there is no material variance from an indictment charging a single conspiracy if a reasonable juror could have found beyond a reasonable doubt the single conspiracy charged in the indictment. *Id. See also United States v. Maholias*, 985 F.2d 869, 874–75 (7th Cir.1993); *United States v. Mojica*, 984 F.2d 1426, 1432 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Ashman*, 979 F.2d 469, 484 (7th Cir.1992), *petition for cert. filed*, April 6, 1993.

Count One of the superseding indictment alleged a single conspiracy to conduct the affairs of Operation Search through a pattern of racketeering activity. A review of the record indicates both that substantial evidence supports Quintanilla's conviction for that crime, and that the district court properly instructed the jury on the law of conspiracy to violate RICO. Consequently, the defendant's variance claim must fail. *See United States v. Aguilar*, 948 F.2d 392, 396 n. 6 (7th Cir.1991).

Finally, we take a moment to address an argument buried in Quintanilla's brief and somewhat related to his claim that the su-

---

**16.** The government did not appeal the district court's decision to dismiss Count Four, and we do not address it.

perseding indictment charged multiple conspiracies. Quintanilla obliquely suggests that the government improperly joined offenses in the indictment, presumably because different counts alleged Search, non-Search, or (in Count Four), both sets of frauds. *See* Fed.R.Crim.P. 8, 14.[17] Under this theory, Quintanilla was prejudiced because the jury heard evidence of frauds that did not pertain to him or to Operation Search.

We reject this claim.. The test of misjoinder is what the indictment charges, not what the proof at trial shows. *United States v. Velasquez*, 772 F.2d 1348, 1354 (7th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986). *See also United States v. Sophie*, 900 F.2d 1064, 1084 (7th Cir.), *cert. denied*, 498 U.S. 843, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990). Under Rule 8, counts may be properly joined if they "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan." Fed.R.Crim.P. 8(a). "This standard is met when the counts 'refer to the same types of offenses occurring over a relatively short period of time, and the evidence as to each count overlaps.'" *United States v. Koen*, 982 F.2d 1101, 1111 (7th Cir.1992) (quoting *United States v. Shue*, 766 F.2d 1122, 1134 (7th Cir.1985)). Under a liberal construction of Rule 8, *see United States v. Archer*, 843 F.2d 1019, 1021 (7th Cir.), *cert. denied*, 488 U.S. 837, 109 S.Ct. 100, 102 L.Ed.2d 76 (1988), the government did not improperly join counts in the superseding indictment.[18]

## IV.

*Leticia Gutierrez*

■ Gutierrez makes two arguments on appeal. First, that the district court erred in denying her pre-trial motion to dismiss the indictment or for a *Kastigar* hearing. Second, that her conviction for RICO conspiracy should be reversed in light of the Supreme Court's recent decision in *Reves v. Ernst & Young*, —— U.S. ——, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), rendered after we heard oral argument in this case. We consider each argument in turn.

Gutierrez voluntarily provided evidence to the government that was subsequently presented to the grand jury which indicted her. She argues that, at the least, the district court should have conducted a hearing to determine if this evidence was immunized.

To be clear, Gutierrez does not claim that she testified before the grand jury, that she received a statutory grant of immunity pursuant to 18 U.S.C. §§ 6002 and 6003, or that she was even promised immunity in return for her cooperation. Gutierrez admits that "Assistant United States Attorney [Mendeloff] cannot be criticized for making promises he did not keep because the record reveals that he was careful to make no explicit promises and that on several occasions he advised defendant of her right to counsel." Gutierrez asks this court to find an implied grant of immunity, or to infer such immunity, on the basis of her cooperation with the investigation performed by the United States Attorney's Office. "[E]nforceable assurances," she suggests, "may be spelled out of a course of dealing between the prosecutor and [a putative defendant], whether they are explicit or implicit, whether they are written or not[,] and whether they are undertaken pursuant to the [federal use immunity] statute or in some other fashion."

In *Kastigar*, the Supreme Court held that if the government proceeds to prosecute a

---

**17.** Quintanilla does not specify which counts he believes were improperly joined. Our discussion does not involve Counts Two and Twenty-seven through Forty, all of which involved the JTPA frauds. These counts were severed prior to trial and later dismissed.

**18.** We point out that, during trial, the district court was careful to separate the evidence as to each defendant. Whenever the government sought to introduce evidence relating to the non-Search frauds, the district court instructed the jury not to consider that evidence against Quin-

tanilla. At the close of trial, the court instructed the jury that, to convict Quintanilla and Gutierrez on Count one, they had to find that Operation was the enterprise, that the defendants were associated or employed by Operation Search, and that they knowingly conspired to conduct or participated in the conduct of the affairs of Operation Search, directly or indirectly, through a pattern of racketeering activity. The court also correctly instructed the jury on the issue of multiple conspiracies.

previously immunized witness, it has "the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." 406 U.S. at 460, 92 S.Ct. at 1665. This usually requires a hearing to determine whether the government derived the evidence it proposes to use from a legitimate independent source.

Under *Kastigar*, the individual claiming the government breached a promise not to use evidence acquired from her must show that, in fact, she offered testimony under a grant of immunity. *See id.; Braswell v. United States*, 487 U.S. 99, 1117, 108 S.Ct. 2284, 2295, 101 L.Ed.2d 98 (1988); *Pillsbury Co. v. Conroy*, 459 U.S. 248, 255, 103 S.Ct. 608, 613, 74 L.Ed.2d 430 (1983). Although *Kastigar* concerned a grant of immunity conferred pursuant to § 6002, this court has previously recognized that, at least where the issue is not in dispute, informal grants of use and derivative use immunity are fully enforceable and implicate the provisions of *Kastigar. United States v. Palumbo*, 897 F.2d 245, 248 (7th Cir.1990) (citing cases).

Nevertheless, Gutierrez cannot show even an informal grant of immunity from the United States Attorney's office. She approached federal authorities with the story of Monreal's scam. AUSA Mendeloff made clear to her that he was not her attorney, that she had a right to an attorney, and that the Federal Public Defender's office would provide her with one. Mendeloff never told Gutierrez or Patrick Reilly, who spoke to the AUSA on Gutierrez's behalf, that Gutierrez would not be prosecuted for her crimes. Quite the contrary, Mendeloff gave every indication that Gutierrez would probably be indicted. Thus, even if Gutierrez expected that her cooperation would shield her from prosecution, Mendeloff's statements demonstrate that any such belief was unreasonable. *See Sophie*, 900 F.2d at 1071.

Despite the absence of an offer of immunity, Gutierrez decided, on more than one occasion, to continue cooperating with the government in the hope of escaping prosecution.

This unilateral decision, although understandable given her situation, in no way binds the government. *See United States v. Costello*, 750 F.2d 553, 556 (7th Cir.1984); *United States v. Rothman*, 567 F.2d 744, 746–47 (7th Cir.1977). Gutierrez makes no claim that, in return for her help, the government failed to make good on its promise to inform the district court of her cooperation at sentencing. Accordingly, because Gutierrez failed to raise a significant, disputed factual issue regarding whether or not the government made a formal or informal grant of immunity to her, the district court did not err in denying her motion for a *Kastigar* hearing. *See Sophie*, 900 F.2d at 1071.

█ We point out, as did the district court, that the authority to immunize a witness is explicitly an executive branch responsibility. In enacting the use immunity statute, "Congress expressly left this decision exclusively to the Justice Department." *United States v. Doe*, 465 U.S. 605, 616–17, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984). For this reason, the Supreme Court has refused to adopt a "doctrine of constructive use immunity" under which federal courts could themselves grant immunity under 18 U.S.C. § 6003. *Id.* at 616, 104 S.Ct. at 1244. *See also Pillsbury*, 459 U.S. at 253–54, 103 S.Ct. at 612–13; *United States v. Angiulo*, 897 F.2d 1169, 1190 (1st Cir.), *cert. denied*, 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990). Accordingly, in the absence of any evidence of either a formal grant of immunity by the government under the federal use immunity statute, or an informal grant that would satisfy that statute's requirements,[19] Gutierrez's claim that the evidence she provided the AUSA is somehow immunized must fail.

Gutierrez has not shown that she was charged under an indictment based on immunized evidence. The district court's decision denying her motion to dismiss the indictment or conduct a *Kastigar* hearing is affirmed.

---

**19.** The extent to which the Supreme Court's pronouncement in *Doe* might limit informal grants of immunity enforceable under §§ 6002 and 6003 is not at issue in this case and we do not address it.

## V.

 Gutierrez argues next that this court should review her conviction for RICO conspiracy in light of the Supreme Court's recent decision in *Reves*, —— U.S. at ——, 113 S.Ct. at 1169–73.[20] In that case, the Court interpreted 18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity...." The Supreme Court adopted the Eighth Circuit's "operation or management" test for § 1962(c) liability, *see Arthur Young & Co. v. Reves*, 937 F.2d 1310, 1324 (8th Cir.1991); *Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), holding that "[i]n sum, ... 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' ... one must participate in the operation or management of the enterprise itself." *Reves*, —— U.S. at ——, 113 S.Ct. at 1173.

Gutierrez points out that this circuit has defined § 1962(c) liability somewhat more broadly than the Eighth Circuit and, consequently, has not used the "operation or management" test. *See, e.g., Overnight Transportation Co. v. Local No. 705*, 904 F.2d 391, 393 (7th Cir.1990); *United States v. Garner*, 837 F.2d 1404, 1420 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988); *United States v. Horak*, 833 F.2d 1235, 1239 (7th Cir.1987). Now, however, the Supreme Court has adopted that test for participation in a RICO enterprise. Gutierrez suggests that, because she was not employed by Operation Search, and thus had no connection with the management of that enterprise, *Reves* requires that her conviction for RICO conspiracy be reversed.

The defendant confuses her conviction for conspiracy (an agreement to commit a crime) with a conviction for a substantive crime. She was charged in Count One of the superseding indictment with violating 18 U.S.C. § 1962(d), which makes it unlawful "for any person to *conspire* to violate any of the provisions of subsection (a), (b), or (c) of this section" (emphasis added). Section 1962(d), unlike § 1962(c), is not a substantive RICO offense; rather, § 1962(d) merely makes it illegal to conspire to violate any of the preceding sections of the statute. *Neapolitan*, 791 F.2d at 497. *See also United States v. Glecier*, 923 F.2d 496, 499–500 (7th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991).

"The content of the agreement criminalized by RICO is ... defined against the backdrop of general conspiracy law." *United States v. Carter*, 721 F.2d 1514, 1529 (11th Cir.), *cert. denied*, 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). As mentioned, a RICO conspiracy requires only an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity. *Neapolitan*, 791 F.2d at 498. "Under this approach, it is only necessary that the defendant agree to the commission of the two predicate acts on behalf of the conspiracy." *Id.* *See also United States v. Stern*, 858 F.2d 1241, 1246–47 (7th Cir.1988).

 One violates § 1962(d), then, when she agrees to violate a substantive RICO offense, regardless of whether she personally agreed to commit the predicate crimes or actually participated in the commission of those crimes. *See Glecier*, 923 F.2d at 500. "Agreement that the [crimes] will be committed by any of the coconspirators on behalf of the conspiracy is sufficient." *United States v. Campione*, 942 F.2d 429, 437 (7th Cir. 1991). *See also Ashman*, 979 F.2d at 485. We have reasoned thus because to require the government to show that all of the al-

---

20. The government argues that Gutierrez has waived this argument because she did not present it to the district court. We disagree. The Supreme Court granted certiorari in *Reves* to resolve a split among the circuit courts of appeals concerning a substantive issue of law. While Gutierrez may have known of the split in authority at the time of her trial, she could not

have known of the Supreme Court's resolution of the issue; certiorari was granted, and the case was decided, after she had been tried and convicted. Gutierrez raised her argument under *Reves* at the first opportunity. We think this is sufficient to allow us to reach the merits of her claim.

leged coconspirators conducted, or participated in the conduct of, the affairs of the racketeering enterprise to the extent mandated by § 1962(c) or other substantive RICO offense would entail "a degree of involvement in the affairs of the conspiracy that is not required in any other type of conspiracy, where agreeing to a prescribed objective is sufficient." *Neapolitan,* 791 F.2d at 498.

In short, our cases make clear that § 1962(d) liability is not coterminous with liability under § 1962(c). It follows that the Supreme Court's decision in *Reves* does not disturb Gutierrez's conviction for RICO conspiracy. *Reves* addressed only the extent of conduct or participation necessary to violate a substantive provision of the statute; the holding in that case did not address the principles of conspiracy law undergirding § 1962(d).

We agree with the district court for the District of Columbia that "[t]o hold that under § 1962(d) [the government] must show that an alleged coconspirator was capable of violating the substantive offense under § 1962(c), that is, that he participated to the extent required by *Reves,* 'would add an element to RICO conspiracy that Congress did not direct.'" *Jones v. Meridian Towers Apartments, Inc.,* 816 F.Supp. 762, 773 (D.D.C.1993) (quoting *United States v. Pryba,* 900 F.2d 748, 760 (4th Cir.), *cert. denied,* 498 U.S. 924, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990)). *See also Fidelity Federal Savings and Loan Assoc. v. Felicetti,* 830 F.Supp. 257, 259 (E.D.Pa.1993).[21] Gutierrez's conviction stands.

The convictions of Carlos Quintanilla and Leticia Gutierrez are AFFIRMED.

---

**21.** The issue of whether at least one alleged coconspirator charged under § 1962(d) must be capable of violating § 1962(c) has not been raised in this case. We therefore do not address it.